Commonwealth *v.* Lockard, Appellant.

Argued November 23, 1936. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Frank J. Reiser, Sr.,* for appellant.

58

*R. J. Puderbaugh,* Assistant District Attorney, with him *Chester B. Wray,* District Attorney, for appellee.

OPINION BY MR. JUSTICE DREW, January 5, 1937:

Roy Lockard and Margaret Karmendi were jointly indicted for the murder of Matthew Karmendi, her three-year-old son. They demanded and received separate trials. Lockard was tried first, and on June 13, 1936, he was found guilty of murder in the first degree and the penalty fixed at death. From the judgment and sentence imposed he took this appeal.

Shortly after nine o'clock on the evening of April 21, 1936, Paul Iorio, a resident of Altoona, heard someone pounding violently on his door. Upon opening it he saw defendant with a wounded and bleeding child in his arms, and behind him, Margaret Karmendi. The child died that night in a hospital. Examination of the body by the coroner's physician disclosed that the skull had been fractured in three places and that a jagged wound on top of the head had laid bare the brain tissue. Each fracture was approximately the same size—four inches long and an inch wide. Any one of the injuries could have caused death.

The record shows that Karmendi, the husband, worked regularly from two in the afternoon until ten at night; that while his wife was at a railroad station one afternoon, defendant spoke to her, and that from this informal meeting a clandestine friendship grew; that on subsequent occasions they met and strolled aimlessly about town together or sat and talked in a passenger station, always in company with the boy; and that she always reached home before her husband's return. The testimony, however, is free of any suspicion of illegal intimacy. These meetings and walks continued intermittently from March 17, 1936, when Lockard first saw Mrs. Karmendi, until April 21, 1936, the date of the boy's death.

That afternoon, apparently without prearrangement, they met at approximately five o'clock, sat and talked in the waiting room of the passenger station until six, and then went on foot to Lockard's home twenty-five blocks away. It was wet and snowing. Mother and child remained outside while he went in for his overcoat. They then walked back to the station, reaching its shelter about seven-thirty. The boy's feet were wet and Mrs. Karmendi proceeded to dry out his shoes and stockings in the ladies' rest room. By nine this had been done, and they began another long walk to the Karmendi home on the other side of the city. It was on this journey that the boy met his death.

Defendant first explained that while he was carrying the boy, an automobile passed on his left and struck the child's head, which was resting on his left shoulder. On being taxed with the utter improbability of such an occurrence, he made a statement on April 22, the gist of which was that Mrs. Karmendi had taken an iron bolt from her coat pocket, declared she was going to get rid of the child, waited for an automobile to pass, and immediately thereafter struck the boy several blows. When defendant repeated this story in a second substantially similar statement, she was brought in to confront him. She vigorously denied its truth and accused him of being solely responsible for the child's death. She then stated that while they were walking home, without any warning, he suddenly took from his coat pocket a railroad spike, and hit the boy with it. She claimed she screamed and struck at his arm.

A third statement was signed by defendant on April 29, 1936. Therein he alleged that he saw Mrs. Karmendi pick up the spike on the way from his home to the station; that at the station, she told him it was their duty to kill the boy—that he was a hindrance and a danger; that, on the way home, she struck the child with the sharp end of the spike, and that he then hit the boy several times with the blunt end so "one wouldn't take all

the blame." He further stated that he placed the spike on the floor of the truck in which the child was taken to the hospital, and threw it out during the trip.

Counsel for the prisoner declared in his opening address to the jury that the defense would be insanity. To prove irresponsibility he called only non-expert witnesses. With but two exceptions, they were relatives and friends of the accused. The burden of their testimony was substantially that defendant had no knowledge of the value of money; that he hated work; that he liked to read the funny papers; that he would write his name on steamed or frozen windows; and that he could not carry on a lengthy conversation on any given subject. The pastor of the church he occasionally attended testified that he knew defendant only slightly, and that in a conversation over a year before had gained the "impression he didn't seem to reason in a straight line." The court below ruled these instances of defendant's conduct did not constitute sufficient basis for the expression of opinions by non-experts that he was insane. This ruling has been assigned as error. The testimony went to the jury, however, to be considered in mitigation of the penalty in the event the accused was found guilty. The court's action was clearly correct. The test of insanity in this jurisdiction, as it relates to crime, is the ability to distinguish between right and wrong*: *Commonwealth v. Szachewicz*, 303 Pa. 410. It has become the established law in this Commonwealth that lay witnesses, offered to express an opinion that defendant is insane, must first state facts personally observed by them that, in the judgment of the court, tend to justify

---

* There is not the slightest doubt of defendant's sanity. A few days after he was found guilty in this case he took the stand as a defense witness in *Commonwealth v. Karmendi*, 325 Pa. 63, and freely admitted the killing and assumed sole responsibility for it. He was submitted to a lengthy examination which demonstrated that he was at least of normal mental capacity, and fully cognizant of the difference between right and wrong.

the opinions about to be expressed: *Commonwealth v. Cavalier,* 284 Pa. 311; *Commonwealth v. Winter,* 289 Pa. 284; *Commonwealth v. Tetrosky,* 313 Pa. 240. This assignment is without merit.

Four days after the killing, as the result of a diligent search, a railroad spike was found on a busy street in the heart of the city. Human hair and blood of the same type as hair and blood on the cap of the victim were discovered thereon. The street led from the scene of the crime toward the hospital. The spike was admitted in evidence over objection. It is contended this was error. In *Commonwealth v. James,* 294 Pa. 156, we held admissible in evidence a sample of blood-stained earth taken from the spot where defendant said he shot the victim even though the earth had not been removed until three days after the killing. Two grounds there supported its admission, uncontradicted expert testimony that the earth contained human blood and defendant's confession. Here, the same grounds were present. The failure to discover the spike until four days after the killing, and the fact that it was found some distance away from the place where defendant alleged he had thrown it do not detract from its competency as evidence. These only raised questions of the weight to be attached to the evidence, a matter wholly within the jury's province.

It is next asserted that the accusatory statements made by defendant should not have been admitted in evidence because of failure to warn him of his constitutional right to refuse to answer any question that might tend to incriminate him. This contention cannot apply to the first and second statements because therein he placed all blame on the woman and in no way incriminated himself. As regards the third statement, which was a confession of guilt, he was informed before he made it that what he said could be used against him, and he knew he was being questioned by officers of the law. There was no evidence of intimidation, or compulsion or

anything else indicating impropriety in obtaining these statements. "Where, by the Commonwealth's witnesses, it is shown that a confession is made voluntarily, without such threat or inducement as might secure a false confession, it must be admitted. If afterwards the defendant testifies, or produces other witnesses who testify, that it was not voluntarily made, it becomes a question for the jury: *Com. v. Aston,* 227 Pa. 112, 115, 116; *Com. v. Shew,* 190 Pa. 23, 24; *Com. v. Epps,* 193 Pa. 512, 515; *Com. v. Van Horn,* 188 Pa. 143, 168; *Com. v. Shaffer,* 178 Pa. 409, 414; *Volkavitch v. Com.,* 9 Sadler 327; Underhill on Criminal Evidence, 2d ed., section 126, p. 242": *Commonwealth v. Spardute,* 278 Pa. 48. Defendant did not challenge the method of securing his confession, either by taking the stand himself or calling witnesses in his behalf. On the other hand, testimony elicited from witnesses for the Commonwealth was to the effect it had been made entirely of his own free will. It is clear the confession here comes within the application of the above rule.

Finally, counsel for defendant complains that the defense was not allowed sufficient time to prepare for trial. The crime was committed on April 21, 1936, and the arrest made the following day. The indictment was returned on June 2, 1936, and the next day two attorneys were appointed by the court to represent defendant, he having pleaded poverty. The case was called for trial on June 11, 1936: cf. *Commonwealth v. Talarico,* 317 Pa. 481. The all-important question in cases of this type is the time allowed defendant himself, and not the interval between appointment of counsel and the date of trial: *Commonwealth v. Meyers,* 290 Pa. 573. In *Commonwealth v. Deni,* 317 Pa. 289, trial began nine days after the killing. A petition for continuance was refused and this was, on appeal, held not to be error. As Mr. Justice KEPHART, now Chief Justice, there declared, at page 292: "In determining whether a continuance should be granted in any criminal case, the nature of

the crime and the circumstances attending it must be considered. The occurrences surrounding a crime, its preparation and execution, may be so involved that more time is required to prepare a defense than where such complicating incidents are not involved. In the latter case a speedy trial could and should be had. In all cases such time should be given for preparation that a charge of undue haste can not be fairly made." A reasonable time must be allowed in which the accused can prepare his defense. The circumstances attending commission of the crime here were in no way intricate or involved. The defendant had confessed his guilt. There were no witnesses to the killing. He and Mrs. Karmendi alone knew the truth. No lengthy preparation for trial was required. The time afforded him was not, therefore, inadequate and refusal of the continuance was proper under the circumstances.

The other assignments are without merit. We have carefully reviewed the record and found in the evidence the ingredients necessary to constitute murder in the first degree.

All assignments of error are overruled, the judgment of the court below is affirmed, and the record is remitted for the purpose of execution.