Commonwealth *v.* Rightnour, Appellant.

106

Argued November 25, 1968.   Before BELL, C. J.,
JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument re-
fused June 17, 1969.

*William H. Nast, Jr.,* with him *Carl B. Stoner, Jr.,* for appellant.

*Jerome T. Foerster,* Assistant District Attorney, with him *LeRoy S. Zimmerman,* District Attorney, for Commonwealth, appellee.

OPINION PER CURIAM, May 9, 1969:
The Court being equally divided, the judgment of sentence is affirmed.

———

OPINION BY MR. CHIEF JUSTICE BELL IN SUPPORT OF AFFIRMANCE, May 9, 1969:
Defendant-appellant was convicted of murder in the first degree and sentenced to life imprisonment. On this appeal he raises three questions which will be discussed after a brief summary of the facts, considering as we must, the evidence and all reasonable inferences therefrom in the light most favorable to the Commonwealth: *Commonwealth v. Williams,* 432 Pa. 557, 248 A. 2d 301; *Commonwealth v. Burns,* 409 Pa. 619, 187 A. 2d 552; *Commonwealth v. Kravitz,* 400 Pa. 198, 161 A. 2d 861; *Commonwealth v. Melton,* 406 Pa. 343, 178 A. 2d 728.

Defendant killed his wife in their apartment on Boas Street in Harrisburg, either after dinner on May 13th or in the early morning hours on May 14th, 1966. They had been having marital trouble for several years, each blaming it on the other. Defendant left their home and went to Phoenix, Arizona, to obtain employment. While in Phoenix, he heard that his wife had sought to have him arrested for desertion. As soon as he could borrow sufficient funds, he returned to Har-

risburg, and for the next several weeks attempted a reconciliation.

On the night of the murder, defendant went to his wife's apartment. They had dinner together, which she prepared, discussed their marital problems, and agreed upon a reconciliation. Then they went to bed and had sexual intercourse. After that, she got up and got some soft drinks. Upon her return, she asked defendant for some money and he gave her $40, which she took and hid. She then returned to their bed, whereupon, according to defendant's testimony, he "went wild." He reached for a screwdriver which was on a night stand next to their bed and admitted that he stabbed her three times with the screwdriver—once in the lung, once near her rib, and one superficial wound. When she was dying she said, "Leon, I love you." He testified that he could not recall when she said that, or whether "it could have been my own mind telling me this." Although her death was caused by strangulation and not by the stabbing, defendant testified that he does not remember strangling his wife at all.*

The next thing defendant remembered after picking up the screwdriver was standing in the hallway and seeing his wife lying dead on the bed. He then wrote a note saying he loved her and cut his arms in three places. He testified that he then returned to their bed and hugged his dead wife.

He next recalls standing in the rain at the corner of Third and Foster Streets, Harrisburg. He hailed a cab which took him to the home of Mr. Archie Moore,

---

* We note in passing that it is astonishing how many murderers after the killing or at their trial are able to remember many of the facts and circumstances and thoughts and events which aid them, but cannot remember many of the facts, circumstances, actions and events which evidence their guilt.

his minister, who lived in Middletown, Pennsylvania. He arrived at his minister's home at approximately 4:30 A.M. on May 14, 1966 and told Mr. Moore that he had killed his wife, whereupon Mr. Moore called the police.

Defendant further testified at his trial that he loved his wife very much and did not intend to kill her.

Patricia A. Metz, a witness for the Commonwealth, testified that in February, 1965, defendant told her "One of these days I am going to kill her [the victim], I am going to kill her." She further testified that approximately two to four weeks before the killing defendant said to her, "Pat, . . . I am going to get rid of her and make her so that no other guy would ever want her."

Mrs. Marie Weber, who is the victim's aunt, and who had raised her from childhood, testified that defendant made threats to kill his wife just a month before the killing. She further testified that the defendant, who was living at her home in Phoenix in Arizona, stated "If he didn't get the money from his wife, he said he was going back east and kill her." Mrs. Weber and her husband then took defendant to the Catholic Church in Phoenix to attempt to obtain money for him to return to Harrisburg. When defendant was not able to obtain the money from the Catholic Church, ". . . then he said 'I'm going back east to kill my wife. I'm going back and finish her off.' "

Defendant contends that all this evidence was insufficient to support a verdict of first-degree murder. Of course, this contention is ridiculous.

Defendant's two other contentions are that the trial Judge committed reversible error when he (1) sustained three challenges *for cause* made by the Assistant District Attorney and (2) refused to permit a psy-

chiatrist to testify as to defendant's state of mind at the time of the victim's death.

## Challenges for Cause

A jury of 63 prospective jurors and nine prospective alternate jurors was impaneled for this case. Appellant contends that a new trial should be granted because the trial Judge improperly exercised or abused his discretion in sustaining the District Attorney's challenges of three prospective jurors for cause. The Court has a wide discretion in such cases, which will be reversed only for palpable abuse or error of law. *Commonwealth v. Gelfi*, 282 Pa. 434, 438, 128 Atl. 77; *Commonwealth v. McGrew*, 375 Pa. 518, 526, 100 A. 2d 467; *Commonwealth v. Pasco*, 332 Pa. 439, 445, 2 A. 2d 736; *Commonwealth v. Fletcher*, 387 Pa. 602, 611, 128 A. 2d 897; *Commonwealth v. Bentley*, 287 Pa. 539, 135 Atl. 310; *Commonwealth ex rel. Fletcher v. Cavell*, 395 Pa. 134, 140, 149 A. 2d 434.

Elizabeth Wagner's examination on her voir dire covered six pages of the notes of testimony. The trial Court stated: "Well, she has twice indicated that she would not vote for a death penalty under any circumstances. . . . The sum total of her testimony on that point doesn't convince me that she would vote for the death penalty if the circumstances justified it. I sustain the challenge for cause."

The Commonwealth's challenge of Mrs. Gornick for cause was likewise sustained by the Court. Mrs. Gornick pertinently said: "Well, as I said, my religion does state that I should not take another. man's life' and, therefore, I do not think that I would vote for the death penalty."

The Commonwealth's challenge of Mrs. Graeff was likewise sustained for cause. Defendant's attorney

asked: "Q. Mrs. Graeff, do I understand that you, in response to Mr. Schaffner's questions, indicated that you could not render a death verdict even if the circumstances warranted it, in any case? Is that what your answer is? A. I believe that's what my answer would be."

Until a few months ago, the law was well settled both in this Court and in the Supreme Court of the United States that a juror could be challenged for cause if he has conscientious scruples or religious beliefs which would prevent him from returning the death penalty or if he has a fixed opinion about the case and the defendant's guilt. *Commonwealth v. Lopinson*, 427 Pa. 284, 296, 234 A. 2d 552; *Commonwealth v. Bentley*, 287 Pa., supra; *Commonwealth v. Gelfi*, 282 Pa., supra; *Commonwealth v. Pasco*, 332 Pa., supra; *Logan v. United States*, 144 U.S. 263, 298. However, appellant relies upon *Witherspoon v. Illinois*, 391 U.S. 510, and *Bumper v. North Carolina*, 391 U.S. 543, which drastically changed the long established law concerning the test for challenges for cause and limited it to cases where a juror had a *fixed* opinion against the death penalty.

In *Witherspoon v. Illinois*, the Court held (pages 522-523): "Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected. . . .

"We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were

those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.**   Nor does the decision in this case affect the validity of any sentence *other* than one of death.   Nor, finally, does today's holding render invalid the *conviction,* as opposed to the *sentence,* in this or any other case."   (Italics in original Opinion.)

In *Bumper v. North Carolina*, 391 U.S., supra, the Court said: "In Witherspoon v. Illinois, decided today, we have held that a death sentence cannot constitutionally be executed if imposed by a jury from which have been excluded for cause those who, without more, are opposed to capital punishment or have conscientious scruples against imposing the death penalty. Our decision in Witherspoon does not govern the present case, because here the jury recommended a sentence of life imprisonment."

We believe there was no abuse of discretion in the trial Judge's ruling on these three prospective jurors, but if there was error, it was not prejudicial or reversible error, since *Witherspoon* and *Bumper* apply only to cases (retroactive as well as prospective) where the penalty or sentence imposed was death.

---

* Mr. Justice BLACK, dissenting, said (pages 538-539) : "Finally, I want to point out that the *real* holding in this case is, at least to me, very ambiguous. . . . For as I read the opinion, the new requirement placed upon the States is that they cease asking prospective jurors whether they have 'conscientious or religious scruples against the infliction of the death penalty,' but instead ask whether 'they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them.' "

## Psychiatric Testimony

At the conclusion of defendant's testimony, his counsel announced that his next witness would be Dr. Harry S. Whiting, a psychiatrist. At this point, the District Attorney requested an offer of proof "on the evidence or testimony that the doctor will submit or make." Counsel for defendant replied: "Dr. Whiting will testify as to the defendant's state of mind at the time he took the life of his wife, at the time of the death of his wife. The Court: Have you anything further to add to that offer or not? . . . Yes, I do." At that point, the District Attorney said, "We would like to urge the Court first to find out whether the evidence that the doctor will give will tend to establish that the defendant at the time of the crime was insane under the rules of the Pennsylvania Supreme Court and this Court, commonly called the M'Naghten Rule. The Court: What is your answer to that, Mr. Stoner? Mr. Stoner: No, no. The Court: More specifically, what do you mean? Mr. Stoner: No, the defendant was not under the M'Naghten Rule. Dr. Whiting will not testify that the defendant was insane under the M'Naghten Rule."

The Commonwealth's objection to the offer of this testimony was sustained by the trial Judge, and we agree with the Court's ruling.

Defendant frankly states that he is opposed to the M'Naghten Rule, and frankly admits that the decision of the lower Court was in accord with the prior recent decisions of this Court. He therefore urges us to overrule *Commonwealth v. Phelan*, 427 Pa. 265, 234 A. 2d 540; *Commonwealth v. Ahearn*, 421 Pa. 311, 218 A. 2d 561, and other recent decisions of this Court. This we decline to do, but, on the contrary, reaffirm the law set forth therein.

In *Commonwealth v. Phelan*, 427 Pa., supra, the Court, in an Opinion by Justice EAGEN, joined in by Chief Justice BELL, Justice MUSMANNO, Justice JONES and Justice O'BRIEN, said (pages 278-279):* *"During the hearing to determine the degree of guilt,*** the court refused to admit medical testimony tending to establish that at the time of the commission of the crimes *Phelan lacked the mental ability to form the intent to kill,* a necessary ingredient of first degree murder, and lacked substantial capacity to conform his conduct to the requirements of the law. This was not error. See Commonwealth v. Ahearn, 421 Pa. 311, 218 A. 2d 561 (1966), and Commonwealth v. Woodhouse, 401 Pa. 242, 164 A. 2d 98 (1960). As stated in Commonwealth v. Ahearn, supra, at 324, 218 A. 2d at 568, *such evidence is not admissible* '(1) to absolve or exculpate and acquit a defendant of crime, or (2) *to prove a lack of specific intent to kill,* and thereby prohibit a verdict of murder of the first degree.' See also, Commonwealth v. Carroll, 412 Pa. 525, 194 A. 2d 911 (1963). Moreover, this testimony was properly received in evidence and considered by the court in mitigation of the penalty during the hearing to determine the sentences to be imposed."

In *Commonwealth v. Ahearn*, 421 Pa., supra, the Court more fully said (pp. 324-325): "We hold that the psychiatric testimony offered in this case is not admissible (1) to absolve or exculpate and acquit a defendant of crime, or (2) to prove a lack of specific intent to kill, and thereby prohibit a verdict of murder of the first degree. This has always been the law of Pennsylvania. Commonwealth v. Tyrrell, 405 Pa., supra. We further hold that [particularly] since the

---

* Justices COHEN and ROBERTS dissented.

** Italics throughout, ours, unless otherwise noted.

Act of December 1, 1959, P. L. 1621, 18 P.S. §4701, (popularly known as the Split Verdict Act), unless psychiatric testimony is introduced for the purpose of showing insanity under the M'Naghten Rule, *(a) it is admissible only after guilt has been determined by a jury or Court, and (b) is relevant and admissible thereafter only for the limited purpose of aiding the jury or Court in fixing the penalty."* This is especially wise since the Split Verdict Act of 1959.

The aforesaid and the following cases answer all the contentions and theories advanced by the appellant and by the minority of this Court.

In *Commonwealth v. Melton,* 406 Pa. 343, 178 A. 2d 728 (1962), this Court again rejected the doctrine or theories of schizophrenic and other kinds of psychopaths and of moronic or deficient mentality or diminished responsibility, and pertinently said (pages 349-350) : "Defendant's third and last contention is that (a) because of his deficient mentality the lower Court did not have the power [after a plea of guilty] to find him guilty of first degree murder with penalty of death, or (b) if it had the power to so find, it abused its discretion in imposing the death penalty.

"There is not the remotest merit to defendant's contention that because of his deficient mentality, the Court did not have the power to convict him of murder in the first degree.

"In Commonwealth v. Smith, 405 Pa. 456, we sustained a verdict of guilty of murder in the first degree with penalty of death, even though defendant was a sexual psychopath. We there said [with one concurrence and no dissents] (pages 459-460) : 'This Court has sustained a verdict of first degree murder with penalty of death where defendant allegedly had an irresistible impulse, was a moron or a mental defective or a sexual pervert or a psychopathic personality, or

had been previously confined in the hospital for the criminal insane for 14 years, or was a schizophrenic psychopath or was an unstable, mentally defective moron, or was feeble-minded: [*citing 10 prior decisions of this Court.*] . . .' "

In *Commonwealth v. Tyrrell*, 405 Pa. 210, 174 A. 2d 852, where, after a plea of guilty to murder, the Court, *in a unanimous Opinion*, by Chief Justice BELL, said (pages 219-220) :

## "Defendant's psychiatric evidence and the applicable Law

"The lower Court on petition of defendant's counsel ordered an inquiry into the defendant's mental condition by two qualified psychiatrists, Charles W. Iobst, M.D., and John C. Lychak, M.D. Dr. Iobst examined the defendant on May 23, 1960, and Dr. Lychak examined him on May 31, 1960. Although written reports were submitted to the Court and to defendant's counsel, neither of these doctors was called to testify. Instead the defendant called Dr. Donald K. Coleman, who had examined the defendant on September 18, 1960, nine days before the first day of trial. Dr. Coleman testified that the defendant fell into the simple type of schizophrenia, which is an impairment in the emotional life but not in the intellectual life. He described his examination as 'Listening to him, watching his mannerisms, watching his affect, his no sense of feeling when he described anything connected with love or death, his behavior, his running away pattern. His thinking was clear. He . . . showed no signs of intellect impairment. It was all in the emotional state. . . .'

"As a result Dr. Coleman determined that the defendant *was psychotic since teen age** and that he was

---

* Italics, ours.

so emotionally upset on March 7, 1960, that 'he would react to an impulse to pick up a loaded shotgun resting at his elbow and fire it at his wife, and that at that time he had no intent to take his wife's life.'

"The doctrine of 'irresistible impulse' or in the modern psychiatric vernacular 'inability to control one's self', whether used to denote legal insanity, or as a device to escape criminal responsibility for one's acts or to reduce the crime or its degree, has always been rejected in Pennsylvania. In Commonwealth v. Neill, 362 Pa. 507, 67 A. 2d 276, Mr. Chief Justice STERN said: 'Apart from the fact that "confusional insanity" is apparently an antiquated and discarded theory and that the proposition that there could be such a thing as a momentary insanity was sharply challenged by an expert witness for the Commonwealth, it would seem quite obvious that defendant's witness failed to differentiate between a mere temporary frenzy or emotional excitation, and insanity within the legal meaning of that term, namely *inability, from disease of the mind*,* to understand the nature and quality of the act and to distinguish between right and wrong with respect to it: Commonwealth v. Szachewicz, 303 Pa. 410, 416, 417, 154 A. 483, 485; Commonwealth v. Lockard, 325 Pa. 56, 60, 188 A. 755, 757. . . Certainly neither social maladjustment, *nor lack of self-control*,* nor impulsiveness, nor psychoneurosis, nor emotional instability, nor chronic malaria, nor all of such conditions combined, constitute insanity within the criminal-law conception of that term.' "

In *Commonwealth v. Woodhouse*, 401 Pa., supra, a defendant was convicted of murdering his sixteen-year-old adopted daughter and the jury fixed the penalty at life imprisonment. While the defense was insanity,

---

* Italics in *Commonwealth v. Tyrrell* Opinion.

118

the Court reviewed many different psychiatric tests which had been advanced over the years and rejected them, and once again reaffirmed the M'Naghten Rule. With respect to the M'Naghten Rule, the Court pertinently said (pages 258-259) : "Until some rule, other than 'M'Naghten,' based on a firm foundation in scientific fact for effective operation in the protection and security of society, is forthcoming, we shall adhere to it. We shall not blindly follow the opinion of psychiatric and medical experts and substitute for a legal principle which has proven durable and practicable for decades, *vague rules that provide no positive standards.*"*

In *Commonwealth v. Carroll,* 412 Pa., supra, the Court pertinently said (page 537) : " '. . . *society would be almost completely unprotected from criminals if the law permitted a blind or irresistible impulse or inability to control one's self, to excuse or justify a murder or to reduce it from first degree to second degree.*** In the times in which we are living nearly every normal adult human being has moments or hours or days or longer periods when he or she is depressed and disturbed with resultant emotional upset feelings and so-called blind impulses; and the young especially have many uncontrolled emotions every day which are euphemistically called irresistible impulses. *The Courts of Justice should not abdicate their function and duty of determining criminal responsibility to the psychiatrist.*** In such event, the test will differ not only with each psychiatrist but also with the prevailing psychiatric winds of the moment.*** " '. . . Only a short

---

* Italics, ours.

** Italics in *Commonwealth v. Carroll* Opinion.

*** Notwithstanding the minority's quotations from some psychiatrists and some articles in law school reviews, it is, I repeat, a matter of common knowledge that psychiatric theories have

time ago that concept [of irresistible impulse] was emphatically presented as an example of the "uniform" opinion of psychiatrists on criminal responsibility; and yet today, "irresistible impulse" is rejected by most psychiatrists as unsound. . . .'*** [Professor] Hall, 'Psychiatry and Criminal Responsibility', 65 Yale L. J. 761, 762 (1956);" State of New Jersey v. Lucas, 30 N.J. 37, 152 A. 2d 50.'

"Just as the Courts cannot abdicate to the psychiatrists the task of determining criminal responsibility in law, so also they cannot remit to psychiatrists the right to determine the intent or the state of mind of an accused at the time of the commission of a homicide."

We again reaffirm our prior decisions (1) that the M'Naghten Rule governs the question and issue of insanity and (2) that testimony by psychiatrists or psychologists or others that defendant was incapable for one or more psychiatric or psychological reasons to form a specific intent to kill (a) is inadmissible on the question of guilt but (b) is admissible on the subject or issue of penalty or sentence. To hold otherwise would not only circumvent and nullify the M'Naghten Rule but would *in practical effect* turn over to psychiatrists the determination of whether the accused was or could be guilty of murder in the first degree and thereby jeopardize Justice.

In the light of the psychiatric testimony in behalf of the defendant in numerous murder cases—see especially such testimony in *Commonwealth v. Ahearn*, 421 Pa., supra, and in *Commonwealth v. Tyrrell*, 405 Pa., supra—the safety of law-abiding citizens would be further greatly endangered and the convictions of

varied widely for many years and are constantly changing *and even today are in a state of uncertainty, conflict and flux.*

dangerous criminals would be substantially reduced, if psychiatric testimony were admissible to prove lack of or incapacity to form an intent to kill.

I find no merit in any of defendant's contentions and I would affirm the judgment of sentence.

Mr. Justice EAGEN and Mr. Justice O'BRIEN join in this opinion.

———

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

"If a doctor were to bleed his patients with leeches today, or if a psychiatrist were to attribute insanity to the moon, the hue and cry would be tremendous. And yet instance after instance may be pointed out wherein the law has remained, sometimes for hundreds of years, curiously rigid, despite the changes in scientific opinion upon which the law was based. Many rules in the criminal law are still affected by early views concerning psychology, which views are now outmoded or repudiated by newer discoveries through experimentation. A large number fail utterly to take cognizance of advances in education and educational methods." Woodbridge, Some Unusual Aspects of Mental Irresponsibility in the Criminal Law, 29 J. Crim. Law & Criminology 822 (1938-39), quoted in Taylor, Partial Insanity as Affecting the Degree of Crime—A Commentary on *Fisher v. United States*, 34 Cal. L. Rev. 625 (1946). In the thirty years that have passed since the foregoing quote was written, psychiatric knowledge has further greatly increased, a factor recognized in practically all subsequent judicial decisions and commentaries. Flying in the face of this trend is the 4-3 decision of this Court in *Commonwealth v. Ahearn*, 421 Pa. 311, 218 A. 2d 561 (1966), which is relied upon by Mr. Chief Justice BELL's opinion in the case now before us. I am thus compelled to dis-

sent from the opinion in favor of affirmance here, and to reinforce my dissenting views in *Ahearn*.[1]

The decision in *Ahearn* has produced only criticism, see 28 U. Pitt. L. Rev. 679 (1967) ; 71 Dick. L. Rev. 100 (1966), just as the only other near-contemporary decision adhering to the *Ahearn* rule, *Fisher v. United States*, 149 F. 2d 28 (D.C. Cir. 1945), aff'd, 328 U.S. 463, 66 S. Ct. 1318 (1946) (affirmance did not reach merits of rule in issue)[2] was met with apparently unanimous disfavor. See Keedy, A Problem of First Degree Murder: *Fisher v. United States*, 99 U. Pa. L. Rev. 267 (1950) ; Weihofen and Overholser, Mental Disorder Affecting the Degree of Crime, 56 Yale L.J. 959 (1947) ; Taylor, Partial Insanity as Affecting the Degree of Crime—A Commentary on *Fisher v. United States*, 34 Cal. L. Rev. 625 (1946). The Supreme Courts of California and New Jersey, two states which apparently followed a rule similar to that in *Ahearn* at the time of the *Fisher* decision, see Weihofen and Overholser, supra at 965, have subsequently unanimously repudiated their old law and now allow the admission of evidence of "diminished responsibility." See *State v. DiPaolo*, 34 N.J. 279, 168 A. 2d 401 (1961) ; *People v. Wells*, 33 Cal. 2d 330, 202 P. 2d 53 (1949) (dissents on other grounds), followed in *People v. Henderson*, 35 Cal. Rptr. 77, 386 P. 2d 677 (1963) and *People v. Gorshen*, 51 Cal. 2d 716, 336 P. 2d 492 (1959).

---

[1] Justice JONES joined in this writer's dissent. Justice COHEN also filed a dissenting opinion.

[2] The Supreme Court affirmed because it believed it should not interfere with the common law development of insanity rules in the District of Columbia, but in no way affirmed the rule on the merits. The Court of Appeals for the District of Columbia Circuit has subsequently implied that it would not have allowed *Fisher* to stand had it not replaced the M'Naghten Rule with the more progressive *Durham* test. See *Stewart v. United States*, 214 F. 2d 879 (D.C. Cir. 1954).

122

See also *Stewart v. United States*, 214 F. 2d 879 (D.C. Cir. 1954). Even in Great Britain, bastion of the common law and birthplace of the M'Naghten Rule, the law has been brought in line with the Scotch practice which has been evolving since the 19th Century, see 28 U. Pitt. L. Rev. 679, 685 n.33 (1967), and diminished responsibility is now cognizable in homicide cases. English Homicide Act, 1957, 5 & 6 Eliz. II, c.11, §2(1); see *Regina v. Dunbar*, 41 Cr. App. R. 182 (1957). Irish legal thought evidences the same trend. See O'Doherty, Men, Criminals and Responsibility, 1 Irish Jurist 285 (1966).

These developments are paralleled by Model Penal Code §4.02(1) (proposed official draft 1962), which provides that: "Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense." All this proves to me that the dissenters in *Ahearn* were hardly voices in the wilderness, but rather represent what quite clearly is the apparently unanimous position of enlightened legal thinkers, while those who support the affirmance today stand with feet firm and teeth tightly clenched, desperately holding out against the advent of the 20th Century.

In my view, the position advanced in Mr. Chief Justice BELL's opinion must be based, at least in part, on the belief that a person is wholly sane or wholly insane, a position which "is now abandoned as based on psychological untruth." Taylor, supra at 629. It is a position that is not even freshly abandoned; writing in 1946, Professor Taylor was able to quote the following, written twenty-three years earlier: "To conceive that an individual is either absolutely responsible or absolutely irresponsible is to fly in the face of perfectly patent facts that are in everybody's indi-

vidual experience and is only comparable to such beliefs of the Middle Ages that a person is possessed of a devil or is not possessed of a devil, and therefore is or is not a free moral agent." White, Insanity and the Criminal Law 89 (1923). Yet by holding that appellant must be (wholly) insane within M'Naghten, or we will not consider his mental state as bearing on his criminal responsibility, the other opinion here has reinforced exactly that medieval and "abandoned" theory and has turned its back on years of psychiatric progress. See *State v. Gramenz*, 256 Iowa 134, 140-41, 126 N.W. 2d 285, 289 (1964).

Nor do I find in the least bit tenable Mr. Chief Justice BELL's argument, here and in *Ahearn*, that psychiatric testimony is so inherently unreliable that it cannot be utilized in cases of this type. The most obvious answer to this is that psychiatric evidence is no less reliable here than it is when used to make the initial M'Naghten determination. See *State v. DiPaolo*, supra; 71 Dick. L. Rev. at 113 (relying also on the fact that psychiatric evidence has been legislatively determined in this Commonwealth to be relevant in setting sentence under 18 P.S. §4701).

Regardless, I cannot accept the proposition that psychiatric testimony suffers from an incurable reliability problem. I do not think it is necessary to argue that psychiatric testimony will *always* be absolutely accurate in order to reach this conclusion. Psychiatry is a science that is inherently less exact than chemistry or physics, but that hardly means that psychiatrists engage in nothing more than guesswork. Additionally, it is safe to say that there is a growing appreciation among psychiatrists of the difficulties involved in giving useful courtroom testimony, and attempts are being made to develop a procedure by which psychiatric testimony can be even more useful to the trier of facts.

See, e.g., Guttmacher, Why Psychiatrists Do Not Like to Testify in Court, 20 Bull. of The Menninger Clinic 300, 306 (1956).

The fact that psychiatric testimony must frequently be based on statements made by the defendant himself is also exaggerated by the *Ahearn* opinion. There appears to be substantial psychiatric evidence that "the insane do not lie—they expose the truth with alarming candor." Roche, Truth Telling, Psychiatric Expert Testimony and the Impeachment of Witnesses, 22 Pa. B.Q. 140, 146 (1951). Although a psychiatrist may not be able to establish the truth or falsity of any given statement, this is not really his aim; rather he is trained to "evaluate the whole of the individual's mental processes from the clinical standpoint." He is thus capable of identifying " 'the suggestibility and unreliability of the intellectually defective and the demented, the hallucinations and the delusions of the psychotic, [and] the irresponsibility of the true psychopath' and from his conclusions he renders his expert opinion." 28 U. Pitt. L. Rev. at 685, quoting Guttmacher and Weihofen, Psychiatry and the Law 365 (1952).

Ultimately it must be remembered that the final decision will be made *not* by the testifying psychiatrist but *by* the trier of facts. There may well be conflicting psychiatric testimony, but this does not mean that psychiatric testimony is necessarily unreliable since psychiatrists—like lawyers—can have legitimate disagreements.

The point is that psychiatric testimony, even if conflicting, is *relevant* and should be available for the consideration of the trier of facts. "If the mental state requisite to a given crime is absent, the crime has not been committed. To what cause the absence of such mental state is to be attributed would seem immate-

rial." Weihofen and Overholser, supra at 962. This is of course the rule that this Court has followed in intoxication cases. See, e.g., *Commonwealth v. McCausland*, 348 Pa. 275, 35 A. 2d 70 (1944). It seems almost incredible that this Court can adhere to a rule that gives intoxicants, who presumably may have some control over their condition, cf. *Powell v. Texas*, 392 U.S. 514, 88 S. Ct. 2145 (1968), the use of evidence that is denied to the mentally ill, who certainly are not responsible for their deficiencies. See 71 Dick. L. Rev. at 111; Weihofen and Overholser, supra at 290; Taylor, supra at 635. "[I]f states of mind such as deliberation or premeditation are accorded legal significance, psychiatric evidence should be admissible when relevant to prove or disprove their existence to the same extent as any other relevant evidence." A.L.I. Model Penal Code, §4.02(1), comment (Proposed Official Draft, 1962). See *State v. DiPaolo*, supra.

One final comment is in order. It has been argued that allowing "diminished responsibility" testimony to reduce the degree of crime will result in shorter sentences and hence earlier freedom for dangerous persons. One proposed solution is to require the jury to return a verdict of not guilty of the higher offense by reasons of the defendant's mental disorder, under which verdict the trial judge could order confinement for care. Weihofen and Overholser, supra at 981. The new Pennsylvania Mental Health and Mental Retardation Act, Act of October 20, 1966 (Spec. Sess.) P. L. 96, §101 et seq., 50 P.S. §4101 et seq., which became effective *after* the decision of this Court in *Ahearn* and was thus not available in deciding that case, provides that: "§4413(a) Whenever any person charged with any crime is acquitted on the ground of insanity or having been insane at the time he committed the crime, the jury or the court as the case may be, shall state such

reason for acquittal in its verdict. (b) In such event, the court may direct the Attorney for the Commonwealth to act as petitioner to initiate commitment proceedings under section 406." Section 406, 50 P.S. §4406, is the Act's civil commitment procedure and allows, inter alia, an officer or agent of a governmental health or welfare organization or agency or "any responsible person" to bring the petition to commit any person in need of care. Thus while we would not need to decide in this case whether §4413 is applicable to a diminished responsibility case, it is clear that under §4406, the Commonwealth will have the option of moving to keep confined any person whom it considers dangerous, or whom it merely considers to be in need of care. The opinion in support of the order then is completely wrong in arguing that the protection and safety of law-abiding citizens would be further greatly jeopardized and the convictions of dangerous criminals substantially reduced if the testimony in question were admissible. Total acquittal is not at issue at all here; that of course is governed by M'Naghten, and the testimony is without doubt admissible. And if a shorter sentence results because of an acquittal of a higher offense, the Mental Health Act provides a simple mechanism for the Commonwealth to keep confined a still dangerous individual.

It has recently been suggested by Dr. Karl Menninger[3] that a significant *cause* of the "lack of safety of law-abiding citizens" is the failure of law and psychiatry to properly communicate and create valid

---

[3] In addition to his unquestioned psychiatric qualifications and achievements, Dr. Menninger is a member of the Project on Mental Health and the Law of the American Bar Association, and formerly served on the Special Commission on Insanity and Criminal Offenders of the State of California and on the Committee on Legal Aspects of Psychiatry of the American Psychiatric Association.

standards of conduct and responsibility. A society that develops a fixation on punishment and revenge may do no better protecting innocent citizens than dealing with "guilty" ones: "But you may ask—the man was dangerous, immoral, ruthless, unpredictable— why *not* eliminate him?

"For the reasons that . . . . Eliminating one offender who happens to get caught *weakens* public security by creating a false sense of diminished danger through a definite remedial measure. Actually, it does not remedy anything, and it bypasses completely the real and unsolved problem of *how to identify, detect, and detain potentially dangerous criminals.*

"What kind of creature was this anyway? And how did he get that way? What gave him the wild and fearful idea? What was he most afraid of? What was burning him inside? What *might* have deterred him? . . . . How do patterns of thought and action such as this get started, and how can the rest of us become alerted in time to prevent such tragedies?

"We will never know the answers to these questions because we were in such a hurry to get this wretch disposed of, as if *he* were our only social menace, and the only one that ever would be born who would do such a ghastly thing. We can wish that, but we know better." Menninger, The Crime of Punishment 108-09 (1968) (Emphasis in original.).

For the foregoing reasons I continue to dissent and would grant appellant a new trial.

Mr. Justice JONES joins in this dissent.