## Commonwealth *v.* Mamon, Appellant.

Argued April 27, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Edward C. Connolly,* for appellant.

*Stephen B. Harris,* First Assistant District Attorney, with him *Kenneth Biehn,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE O'BRIEN, November 17, 1972:

On March 23, 1967, Lorraine Mullery was murdered at approximately 8:30 a.m. at her home on Peony Lane in Levittown, Bucks County. On that morning the victim's husband, oldest son and daughter, Patty, left

the home at approximately 7:30 a.m. Some ten minutes later, the appellant, Mary Mamon, was seen walking into the garage of the Mullery home in a man's disguise. Within approximately five minutes, Ethel Markham, whose niece had recently broken off an engagement to marry Robert Mamon, appellant's son, received a telephone call inviting her to the Mullery home, four doors away from where she lived. Approximately twenty-five minutes later Ethel Markham went to the Mullery home, but no one answered her knock. When she returned home, Ethel reported this to her daughter, Nancy, and almost immediately Nancy went to the Mullery home.

Nancy Markham testified at trial that as she approached the door, it opened, she entered and behind the door was a person she first thought to be a man. After she walked in, a voice behind her said, "Ethel, I have you now." Then Nancy turned around and a person who appeared to be a man said, "Carol". Nancy answered, "My name's not Carol, my name's Nancy". Nancy had known Mary Mamon, as they had played games together in the Markham's home on many occasions, and she quickly recognized this "man" to be Mary Mamon. Nancy testified that she then saw a hammer in Mary's hand and that Mary began to chase her around the house. She chased Nancy into the upstairs, where Nancy tried to get out a window. As Mary came up the stairs, she said, "Now, Nancy, I have you." However, Nancy managed to escape and ran downstairs. During the chase, she saw Patty's brother, Donald, in an upstairs bedroom, and his mother in a downstairs bedroom lying on the floor in pools of blood. Appellant trapped Nancy in the hallway on the first floor. Nancy remembered being hit with the first blow of the hammer in the back of the head, and then she became dizzy and passed out.

Between 8:55 and 9:00 a.m., Patty Mullery returned and found Nancy Markham lying on the floor between the downstairs bedrooms with severe head injuries. The police were summoned and they, in turn, found Lorraine Mullery lying dead on her bedroom floor and Donald Mullery in a second floor bedroom suffering from severe head wounds.

The Commonwealth's theory on the events of March 23, 1967, was that the Mullery house had been used as a deathtrap in which to lure Ethel Markham, whom appellant blamed for the breakup of her son's engagement, as Ethel testified she would not have allowed appellant in her home if, in fact, appellant had gone directly there. According to this theory, Lorraine Mullery, Donald Mullery and Nancy Markham were merely victims of circumstance.

After a jury trial, appellant was found guilty of murder in the first degree and the jury fixed sentence at life imprisonment. After denial of her post-trial motions and imposition of the judgment of sentence, she filed this appeal.

Appellant's principal allegations of error concern evidence seized as the result of what she contends were two unconstitutional searches.

The first search, which occurred on March 24, 1967, occurred after appellant had signed a consent form, which reads as follows:

"I, Mary S. Mamon, having been informed of my constitutional rights to have a search made of the premises hereinafter mentioned without a search warrant and of *my right to refuse to consent to a search,* hereby authorize Richard Batezel, Charles Shaw, James Dunn, other police officers of the Township of Bristol and County of Bucks in the State of Pennsylvania to conduct a complete search of my residence and '62 Olds F85 and '64 red Chevelle—located at 71 Queensbridge Road, Levittown, Middletown Township, Bucks County,

Pennsylvania. These officers are authorized by me to take from my residence and vehicles any letters, typewriters, papers, materials, clothing, all kinds of footwear, or other property which they may desire from the said residence and attached garage and said vehicles.

"This written permission is being given by me to the above-mentioned officers voluntarily and without threats or promises of any kind." (Emphasis supplied.)

Appellant contends that this consent should be held to be invalid because it was unlawfully coerced. In arguing that appellant's consent was voluntarily given, the Commonwealth emphasizes the events which immediately preceded the signing by appellant of the consent form.

When the district attorney asked appellant, who had already been given the full *Miranda* warnings, to sign the consent form, according to the testimony which he gave at the suppression hearing, the following occurred: "I repeated—I said to her, 'Are you sure that you don't want to call Mr. Connolly [appellant's attorney]? I'm not going to stop you. Certainly you have every right to call him.' And her answer was, 'No, I'll skip it,' and I said 'It's entirely up to you', and she said, 'If I didn't sign—I'm sorry—let me see—if I didn't sign, would you get a search warrant?' and I said 'We probably could.'"

Appellant first argues that since the district attorney told her that he "probably could" get a search warrant if she refused to sign the consent form, this case is controlled by the case of *Bumper v. North Carolina,* 391 U.S. 543, 88 S. Ct. 1788 (1968), where the court said at 550: "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—

albeit colorably lawful coercion. Where there is coercion there cannot be consent."

However, in *Bumper*, the authorities claimed to have a warrant authorizing the search. Here, the testimony showed that appellant realized that she faced a decision between consenting to the search or speculating on whether the district attorney could obtain a warrant. Thus, appellant verbalized her knowledge that she was surrendering a right of which she was fully apprised. If the foregoing were all that transpired before appellant signed the consent form, there would be no doubt that her consent was valid. However, appellant also argues that, in considering whether her consent was voluntary, we must also consider the events of the entire evening, including the three-hour period during which she was in custody before she finally consented to the search. According to appellant, the totality of these circumstances constitutes "coercion" as a matter of law.

The events leading up to appellant's consent to the search on March 24, 1967, began early in the morning of the same date when the police arrived at appellant's home with an arrest warrant for her son, Robert, on disorderly conduct charges. At that time, appellant stated a desire to remain home with her younger son rather than accompany Robert to the police station. Shortly before 3:00 a.m., on March 24, the police returned to appellant's home and requested that she go to the police station. Although they had no warrant for her arrest, or gave her no reason for their request, she accompanied them to headquarters. Upon her arrival, she immediately asked to see her son, but was not permitted to do so. Before any questioning began, the district attorney, who was the principal interrogator, advised appellant of her constitutional rights and told her they were invesigating a murder. At that time he did not inform appellant that she was a suspect, although later, in court, he admitted that during that

questioning he did consider appellant a suspect. Moreover, the district attorney neither told appellant that she was under arrest nor that she was free to go.

The questioning proceeded for several hours in a room at police headquarters occupied by appellant and at least four or five police officers in addition to the district attorney. At one point during this questioning appellant apparently consented to an examination of her hair, which was performed by one of the police officers present. After a couple of hours, they asked appellant if they could clean her fingernails without advising her that any evidence so obtained could be used against her. Almost immediately after the fingernail scraping, the police asked her if they could take her fingerprints. Appellant, who by this time must have been rather curious, asked why this was necessary, and she was told it was just routine, so she consented. Later, when she returned from the fingerprinting session, the questioning resumed. It was then that she was asked for permission to search her home. Appellant thereupon asked if she could talk to her attorney; however, while the police were searching for the appropriate phone book, appellant changed her mind and decided that she did not want to see an attorney. The district attorney presented her with a consent form, which had been prepared and completed in advance. She signed the form sometime between 5:00 and 6:00 a.m., after about three hours of continuous interrogation, fingerprinting, hair searching, and fingernail scraping.

Appellant claims, and indeed the record fully supports her claim, that, in view of the totality of these circumstances, her "consent" to waive her constitutional rights under the Fourth Amendment was unlawfully coerced. It has long been recognized that consent to warrantless police searches and seizures is effective only if it is given freely, specifically, unequivocally, and voluntarily. *Bumper v. North Carolina, supra; Villano*

*v. United States,* 310 F. 2d 680, 684 (10th Cir. 1962) ; *Judd v. United States,* 190 F. 2d 649, 651 (D.C. Cir. 1951) ; *Commonwealth v. Harris,* 429 Pa. 215, 221, 239 A. 2d 290, 293 (1968). Merely signing a consent form prepared prior to the interrogation will not usually suffice to prove a valid waiver.

To show an effective consent or waiver, the entire set of attendant circumstances surrounding the alleged waiver must be carefully examined. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938) ; *United States ex rel. Harris v. Hendricks,* 423 F. 2d 1096, 1099 (3d Cir. 1970) ; *Villano v. United States, supra,* at 684; *Judd v. United States, supra,* at 651; *United States ex rel. Anderson v. Rundle,* 274 F. Supp. 364, 370-71 (E.D. Pa. 1967), aff'd 393 F. 2d 635 (1968) ; and a *total* absence of duress or coercion, either express or implied, must be shown. *Commonwealth v. Harris, supra,* at 221 Where appellant was questioned and examined for several hours in the middle of the night by four or five officers, and was worried about her son, the strong possibility exists that her signing of the consent form was not the product of her will freely given, but rather the result of her submission to the will of the police.

The Commonwealth tried to establish that appellant's consent was not coerced by introducing the testimony of witnesses to the effect that appellant was alert during the entire period of custody and treated her interrogation at the hands of the authorities as a "challenge" in which she was able to keep "a step ahead" of the authorities by anticipating their questions. However, because the conduct of the police in this particular case was so fraught with the potential for coercion, we are not convinced that appellant's "consent and waiver" of her rights was voluntary. Nevertheless, based on what would have been the probable impact of the evidence seized as a result of the March 24 search on the minds of the jury, we are convinced

that even if error, the admission of this evidence was harmless error beyond a reasonable doubt. *Harrington v. California,* 395 U.S. 250, 89 S. Ct. 1726 (1969); *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824 (1967); *Commonwealth v. Padgett,* 428 Pa. 229, 237 A. 2d 209 (1968); *Commonwealth v. Pearson,* 427 Pa. 45, 233 A. 2d 552 (1967). Although the record does not make clear what particular bits of evidence were seized as a result of this March 24 search,[1] as distinguished from the several other searches conducted of appellant's home and automobiles, it is clear that in light of the other evidence introduced, the evidence confiscated on March 24 was merely cumulative in nature. Furthermore, there was no extensive comment upon this evidence. Consequently, we are convinced that this evidence played an insignificant role at the trial.

Much more important was the evidence seized as the result of a second search of her home, conducted on March 29, 1967. This search was conducted pursuant to a warrant obtained on the sworn affidavit of a Bristol Township police detective that he had reliable information from two eyewitnesses, who had seen appellant entering the driveway of the decedent's home shortly before the murder was committed, and that Nancy Markham, who was beaten in the Mullery home shortly after the murder, had identified appellant as the person who administered the beating.

According to appellant, this affidavit was insufficient because the two eyewitnesses were described as "reliable" without any underlying circumstances which would enable the magistrate to test their reliability.

---

[1] The Commonwealth admitted taking a ten or eleven-page letter addressed to "Marianne", some correspondence, letters, and a composition-type notebook on the morning of March 24, 1967. In addition, one of the officers present during the search testified that he observed a basket full of damp laundry in appellant's home that morning.

*Aguilar v. Texas,* 378 U.S. 108, 84 S. Ct. 1509 (1964). The Commonwealth argues that the fact that the detective's sources were "eyewitnesses" is itself evidence of their reliability. In support of this argument, the Commonwealth quotes the Superior Court's opinion in *Commonwealth v. Crawley,* 209 Pa. Superior Ct. 70, 223 A. 2d 885 (1966), at page 79, where it said: "This magistrate was told that a neighbor who saw appellant move the stolen goods out of the tavern and into his premises informed the police of this fact. Such information volunteered to the police by an eyewitness makes a strong case for its credibility; it suffices to support a finding of probable cause in the mind of a neutral and detached magistrate."

However, in *Crawley,* the eyewitness was also identified as a neighbor, who had personally approached the police. In the instant case, on the other hand, the alleged "eyewitnesses" are cloaked in anonymity. There is no indication that their names or their whereabouts are known to the police. Consequently, there is little to indicate to the magistrate that the sources of the information were legitimate eyewitnesses, and if the presence of the "eyewitnesses" were all that were alleged to support a finding of probable cause, we do not believe that they would be sufficient.

However, the affidavit also alleged that Nancy Markham, one of the three victims beaten on the day in question, had later identified appellant as the perpetrator of the crime. Under normal circumstances, the statement of a victim of a crime would be sufficient to create the probable cause necessary for the issuance of a search warrant. Cf. *Brown v. United States,* 365 F. 2d 976, 979 (D.C. Cir. 1966).[2] Unfortunately, however,

---

[2] *Brown* was not a search and seizure case, but rather was an arrest case where then Judge BURGER, speaking for the court, stated that "[a]lthough the police could not . . . judge the reliability of the information [leading to the arrest] on the basis of past

the circumstances in this particular case are not normal because of Nancy Markham's condition.[3]

However, it is unnecessary for the Court to resolve either of these complex questions of the sufficiency of each informant individually. The Court is presented with an affidavit containing two independent sources of information, the eyewitnesses and the victim, each of which points to appellant as the murderer, yet each of them, standing alone, arguably does not possess a sufficient guarantee of reliability to create the probable cause necessary to issue a search warrant. Given this situation, it makes no difference that neither of the sources alone would suffice for probable cause. When two *independent* informants both supply the same information about a particular crime to the police, each source tends inherently to bolster the reliability of the other. Although the information supplied by one questionable source may be insufficient, the probability is extremely small that a second independent source would supply identical information if it were not probably accurate. When faced with such a situation, the police undoubtedly have a reasonable basis for further investigation. As the Supreme Court pointed out in *Beck v. Ohio,* 379 U.S. 89, 96, 85 S. Ct. 223, 228 (1964), probable cause means only the *probability* and not a prima facie showing of criminal activity. See also *McCray v.*

experience with the informant . . . the victim's report has the virtue of being based on personal observation, a factor stressed in *Aguilar v. United States* [sic]."

[3] There is serious doubt as to Nancy Markham's ability to identify anyone on the date she is alleged to have supplied this information. According to her physician, she was "not capable of rationally reasoning" on the date in question. Thus, it is questionable whether (had all the facts been known by the magistrate) her identification would have provided a neutral magistrate with enough evidence to make an independent determination of probable cause.

*Illinois,* 386 U.S. 300, 311, 87 S. Ct. 1056, 1062 (1967). The instant case presents just such a situation.

Consequently, although the statement of the two unidentified alleged eyewitnesses alone, or the identification of Nancy Markham alone, arguably may not be sufficient to establish probable cause, acting together, each complements the other sufficiently to produce the reliability necessary to create probable cause. Therefore, the information on the face of the affidavit is sufficient to establish probable cause for the issuance of the search warrant.

Appellant next argues that the seizure went far beyond what the warrant authorized the police to seize. The affidavit stated that the police had "probable cause to believe that: the said Mary Mamon (sic) has bloodstained clothing, wet weather footwear, shoes, a blunt instrument, a typewriter, tape recorder with several tapes, and other papers all of which relate to the aforesaid murder."

Eighty-three items were seized pursuant to this warrant. The court did find that six of these items were neither within the ambit of the warrant nor were they lying openly and, therefore, not subject to seizure. See *Ellison v. United States,* 206 F. 2d 476 (D.C. Cir. 1953). However, none of these six items was offered into evidence at trial, so the question is academic.

Appellant next argues that it was error for the court to deny certain items she requested in her bill of particulars, specifically:

"13. State what evidence is known to the District Attorney or any other law enforcement agency which would:

"(a) show or tend to show that the crimes alleged to have been committed by the defendant were in fact committed by some other person;

"(b) show or tend to show that the crimes alleged were not committed by the defendant;

"(c) show or tend to show that the crimes alleged were committed by the defendant in concert with another person.

"14. State whether or not any law enforcement agency discovered any fingerprints, footprints, palm prints or any other prints of the defendant in conducting the investigation of this case. State further:

"(a) where the said prints were discovered;

"(b) whether photographs of the prints were taken and where the photographs are located;

"(c) whether the said prints were subjected to any tests or analysis;

"(d) whether any reports were rendered in connection with the tests or analysis referred to above;

"(e) where the reports if any from the tests or analysis as indicated above are presently located. . . .

"20. State when Nancy Markham first identified the defendant as her assailant:

"(a) Who was present?

"(b) When was the identification made?

"(c) Where was the identification made?

"(d) Was the identification made from a photograph, from her memory, from a description given from another person or from what other source."

The court refused to grant these requests of appellant on the basis of Rule 310 of the Pennsylvania Rules of Criminal Procedure, which provides, in pertinent part, that: "The court may order the attorney for the Commonwealth to permit the defendant or his attorney, . . . to inspect and copy or photograph any written confessions and written statements made by the defendant. No other discovery or inspection shall be ordered except upon proof by the defendant, after hearing, of exceptional circumstances and compelling reasons. . . ."

Since there is no evidence that the Commonwealth withheld evidence favorable to the defense, cf. *Brady v. Maryland,* 373 U.S. 83 (1963), and the appellant did

not present evidence of "exceptional circumstances" although given the opportunity to do so, the court did not err in denying appellant's request.

Appellant next contends that the court erred in refusing to permit defense counsel to inquire of prospective jurors what they had read about the case. In seeking to discover this information, appellant's counsel was motivated by fear that the jurors might have been aware that appellant had been previously tried for murder in a spectacular and widely-publicized trial. However, the questions which the defense sought to ask were very broad and the appellant's brief admits that there was "practically no way to make the inquiry without suggesting to a juror the existence of [the prior trial for murder]." Consequently, we cannot say that the trial court abused its discretion in refusing to permit the questions. See *Commonwealth v. Rightnour*, 435 Pa. 104, 253 A. 2d 644 (1969).

Appellant's last contention concerns the court's alleged error in commenting upon the appellant's failure to produce her son, Maurice Mamon, whom her counsel had previously identified as an alibi witness. However, an examination of the record indicates that appellant's counsel, in his opening remarks, had told the jury that they would hear from Maurice Mamon as to where his mother was when the murder was committed. It has been repeatedly held that counsel may not, in his opening statement state facts which he cannot prove. *Commonwealth v. Quaranta*, 295 Pa. 264, 145 A. 89 (1928).

Judgment of sentence affirmed.

Mr. Justice POMEROY and Mr. Justice MANDERINO concur in the result.