364 A.2d 677

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**William DICKERSON (two cases).**

Supreme Court of Pennsylvania.

Submitted Nov. 18, 1975.

Decided Oct. 8, 1976.

600

Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Maxine J. Stotland, Philadelphia, for appellant.

Cecil B. Moore, Philadelphia for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

JONES, Chief Justice.

This is an appeal [1] by the Commonwealth from

1. We have jurisdiction pursuant to the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, Art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1975–1976).

602

the Order of Judge Juanita Kidd Stout of the Common Pleas Court of Philadelphia County suppressing the confession of William Dickerson, appellee, as the result of an unconstitutional arrest.

On October 5, 1974, at 4:45 p. m. William Askew, age seventeen, was stabbed to death in the rear yard of a home on Wyoming Avenue in Philadelphia. That same evening, Detective Porter, twice went to appellee's home in an attempt to question him concerning the stabbing. Appellee was not home and Porter left word with his mother asking that appellee come to Police Headquarters for questioning. On October 6, appellee went to the Headquarters and after questioning was released. Two days later, appellee was taken to Headquarters by police officers for a second round of questioning. After nine hours of intermittent interrogation, appellee was released.

Detective Porter then directed his investigative efforts elsewhere. On October 9, he interviewed William Fowler, age fourteen, and Ronald Allen, age eighteen. Both witnesses gave a signed written statement, wherein they each recounted that fifteen minutes prior to the killing, they saw Dickerson, Askew, and Michael Beatty walking together in the direction where the stabbing occurred.

Michael Beatty, age nineteen, was then questioned on October 14. He was given his *Miranda* warnings and agreed to answer questions. The first interrogation resulted in a statement which Detective Porter characterized as incomplete and false based upon other information already gathered. Beatty then consented to a polygraph examination, the results of which seemed to confirm Porter's suspicions. Beatty was interviewed a second time and gave a four page statement which he read and signed. This statement stated that Beatty had witnessed Dickerson stab Askew and corroborated portions of other information Porter had in his possession. Beatty was later charged with hindering apprehension or

prosecution, this based upon his first falsified statement. However, Beatty was not charged as a co-defendant.

In addition to the above information, Porter had gathered signed statements from three other people who knew appellee. Each witness said he or she had heard that the appellee had stabbed Askew.[2]

2. Keeping in mind the practical nature of the test for probable cause and the admissibility of hearsay information in making out probable cause (discussed infra), an excerpt from Betty Sterling's testimony at the suppression hearing will indicate its value:

"Q [District Attorney] 'The Sunday after it happened, a girl named Debbie, she's a friend of my daughter's, came to my house and told me that a boy named "Flash" [nickname for Dickerson] was the person who had stabbed and killed the boy.'

A Yes.

Q Do you remember?
 Now, you have said that to Detective Porter, did you not?

A I am positive I said that after he asked me a question.

Q Did you say that to Detective Porter or not?

A Yes.

Q Very well.

A I said that to Detective Porter.

Q 'I told her I did not believe her because I know "Flash". She [sic] was interested in my daughter Gwendolyn. Debbie left my house, and returned a short time later; and "Flash" was with her. And when he came into my house, I told him that I did not like liars.'
 Do you remember saying that to Detective Porter?

A Yes, I do.

Q And then I asked him, 'Did you do it,' meaning did he stab the boy?' [sic].

A Yes.

Q Did you say that to Detective Porter?

A Yes, I did.

Q 'And he never answered me. He just laughed and moved around the floor.' Did you say that to Detective Porter?

A Yes, I did.

Q 'He never said that he did not do it. So, from his actions, it indicated to me that he did do it.'
 Did you say that to Detective Porter?

A Yes, I did.

Q 'My three smaller children was [sic] in the living room at the time. I did not go on to ask him anything else at that time. I wanted "Flash" to leave my house.'

Armed with the statements of six identified witnesses: (1) two of whom placed the appellee and the eyewitness with the victim near the scene of the crime just prior to the stabbing; (2) three of whom had heard that the appellee had committed the stabbing, and (3) the statement of an eyewitness who said he saw the appellee stab Askew, Porter applied to Judge Wood for an arrest warrant. Judge Wood issued the warrant and Dickerson was arrested on October 17, 1974, at 1:10 p. m. Dickerson arrived at Homicide Headquarters at 1:35 p. m. and after receiving his *Miranda* warnings, he confessed to the crime. Dickerson read and signed his statement at 3:02 p. m., one and one-half hours after his arrival at Headquarters.

██ A motion to suppress the evidence was filed on January 3, 1975, primarily challenging the voluntariness

Did you say that to Detective Porter?
A Yes, I did.
Q 'He showed me a piece of paper with a detective's name on it; and then he said that he would get a lawyer.'
Did you say that to Detective Porter?
A Did I say that?
Q Did you say that to Detective Porter?
A Yes, I did.
Q 'Shortly after that, he left my house. Later, I told my daughter Bonita that "Flash" was at our house and that he said he killed the boy.'
Did you say that to Detective Porter?
A No, I did not say that in the words.
Q You never—
A Detective Porter, I was waiting until I came in the courtroom to tell Detective Porter wrote it the way he wrote it.
MR. MOORE: Pardon me? Read that.
(The last answer was read back by the court reporter.)
BY MR. KILLEEN:
Q 'And that was because of the way he laughed, and acted, and that he did not say that he did not do it when I asked him. I got the feeling that he really did stab the boy.'
Did you say that to Detective Porter?
A I said that to Detective Porter; and I am saying that to you because it is a matter of opinion.
Record, vol. 1, pp. 161–163.

of appellee's confession. A six day suppression hearing followed. At the conclusion thereof, Judge Stout issued an opinion declaring the arrest warrant and subsequent arrest invalid. She found that the warrant was issued upon insufficient information to establish probable cause and appellee's confession was suppressed as a fruit thereof. This conclusion being unsupported by the findings of fact and the applicable legal authority, we reverse.

To be constitutionally valid, an arrest must be based on probable cause. U.S.Const. Amend. IV; Pa. Const. Art. I, § 8 P.S. Probable cause has been defined as those facts and circumstances available at the time of the arrest which would justify a reasonably prudent man in the belief that a crime has been committed and that the individual arrested was the probable perpetrator. *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Brinegar v. United States*, 338 U.S. 160, 69 S. Ct. 1302, 93 L.Ed. 1879 (1949); *Commonwealth v. Bailey*, 460 Pa. 498, 333 A.2d 883 (1975); *Commonwealth v. Jones*, 457 Pa. 423, 322 A.2d 119 (1974); *Commonwealth v. Daniels*, 455 Pa. 552, 317 A.2d 237 (1974); *Commonwealth v. Mamon*, 449 Pa. 249, 297 A.2d 471 (1972); *Commonwealth v. Brayboy*, 431 Pa. 365, 246 A.2d 675 (1968). The test is not one of certainties but rather one of probabilities dealing with the considerations of everyday life. It is not equivalent to the "proof beyond a reasonable doubt" standard applied at trial. *See Commonwealth v. Jones*, supra; *Commonwealth v. Williams*, 235 Pa.Super. 347, 341 A.2d 201 (1975), and cases cited supra. Necessarily the test for probable cause is the same whether or not a warrant is present, since an arresting officer must be aware of information sufficient for the issuance of a warrant at the moment he makes an arrest. *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L. Ed.2d 306 (1971); *McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); *see also In Re Betrand*, 451 Pa. 381, 303 A.2d 486 (1973). Analogies

therefore to cases involving a warrantless arrest are appropriate in the instant case.

In reaching her decision, Judge Stout relied upon *Commonwealth v. Bailey,* supra; *Commonwealth v. Daniels,* supra; *Commonwealth v. Jeffries,* 454 Pa. 320, 311 A.2d 914 (1973); and *Commonwealth v. Mamon,* supra. A review of these cases indicates however that they are not factually similar to the instant case.

In *Bailey,* the invalid arrest was based solely upon the statement of an unidentified informer placing Bailey in the neighborhood on the night of the crime with a .22 caliber revolver. No direct evidence linking Bailey with the offense was present; nor was the reliability of the informant established in accordance with *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

In *Daniels,* the appellant had been arrested based on a witness's statement that he saw two young men acting suspiciously in the area at the time of the homicide and an anonymous telephone tip that "deadleg" had committed the crime. The witness's statement contained a very general description of one of the two young men which description the arresting officer admitted fit three young men in the area including Daniels. This witness did not indicate that the person described had done anything criminal. Moreover, the reliability of the anonymous phone caller was never constitutionally established. The two bits of information were found insufficient, individually or jointly, to establish probable cause.

In *Jeffries,* the appellant was arrested after he quickened his pace upon seeing two officers in an unmarked car observing him and then broke into a run when the officers began to pursue him on foot. The Court decided that there was no indication that appellant had committed a crime and reversed the conviction as a result.

The final case cited by Judge Stout was *Commonwealth v. Mamon, supra.* In *Mamon,* the question presented was whether or not the police officers had probable cause to search the appellant's home. This Court found that there was probable cause for the search and affirmed Mamon's conviction. The information held sufficient for probable cause to search consisted of: (1) two statements from two unidentified witnesses who said they had seen the appellant disguised as a man enter the victim's home where the homicide occurred just prior to the murder; and (2) the statement of one of Mamon's victims who identified Mamon as the perpetrator.[3]

In *Mamon,* the Court held:

" . . . . Although the information supplied by one questionable source may be insufficient, the probability is extremely small that a second independent source would supply identical information if it were not probably accurate.

 \* \* \* \* \* \* \* \*

. . . . acting together, each complements the other sufficiently to produce the reliability necessary to create probable cause."

449 Pa. at 259, 297 A.2d at 477.

Each of the above four cases are distinguishable on their facts from the present case. Three of the four deal with unidentified informers and the problem of validating their testimony as required by *Spinelli* and *Aguilar.* The instant case presents no such problem. All six witnesses were identified and gave formal statements to the police. Each story, to some degree, repeated information given in the other statements, thereby bolstering their

---

**3.** Although this witness was severely discredited by medical testimony which characterized her as incapable of rational thinking at the time of the identification, the Court considered it valid evidence when coupled with the other statements. 449 Pa. at 260, 297 A.2d at 477.

reliability. The fourth case, *Jeffries*, is so different on its face that further discussion is not necessary.

Our research has not uncovered a single case in which an arrest based upon evidence of the quantity and quality of that present here, was found to be violative of the Constitution.

 Judge Stout, in conclusion of law number two,[4] stated:

> "2. Even though Michael Beatty was an alleged witness, the eyewitness status, per se, does not establish reliability, *Commonwealth v. Mamon*, 449 Pa. 249, 297 A.2d 471 (1972). Moreover, whatever reliability Beatty may have had was discredited by Detective Porter himself, who was so convinced of his unreliability that he had him charged with hindering apprehension or prosecution."

This conclusion does not follow logically. Beatty was charged with the hindering offense for the first statement he made which Detective Porter believed to be false because of contradictory statements Porter had already gathered. Beatty's second statement, to the contrary, fell right into line with the other statements giving it independent indicia of reliability. The later statement was not discredited by the charges lodged. Judge Stout also characterized the statements of the three witnesses who had heard that Dickerson had stabbed Askew as neighborhood gossip. This we do not dispute; these statements were clearly hearsay. However, hearsay evidence is considered valid information in testing probable cause to arrest. *Draper v. United States*, 358 U.S. 307, 79 S. Ct. 329, 3 L.Ed.2d 327 (1959); *Brinegar v. United States*, supra; *In re Betrand*, supra.[5] We agree that

4. Record, vol. 2, p. 456.

5. The reliability of the hearsay information was bolstered by the independent account given by Michael Beatty which recounted the identical information.

standing alone the three hearsay statements would be insufficient. Also, the two witnesses' statements placing Dickerson at or near the scene with the victim just prior to the stabbing, alone, might be insufficient. However, those five statements coupled with the identified eyewitness's statement that he saw Dickerson stab Askew were clearly sufficient to justify a reasonably prudent man in the belief that Dickerson had stabbed Askew.

In *Brinegar v. United States,* supra, the United States Supreme Court stated,

> "The rule of probable is a practical, nontechnical conception affording the best compromise that has been found for accommodating . . . often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officer's whim or caprice."

338 U.S. at 176, 69 S.Ct. at 1311. The probability that Dickerson stabbed Askew having been established by the information gathered by Detective Porter, the subsequent arrest of Dickerson was not left to the whim or caprice of the officer. To permit the lower court's decision to stand would therefore unduly hamper law enforcement, a result not intended by the concept of probable cause.

We therefore reverse and remand.

ROBERTS, J., filed a dissenting opinion in which MANDERINO, J., joins.

EAGEN, J., concurs in the result.

ROBERTS, Justice (dissenting).

I dissent. The trial court determined that the defendant was arrested without probable cause and suppressed the statement obtained from him following that arrest. The trial court's decision follows from its findings of fact. These findings are supported by the record.

Therefore, the order of the trial court should be affirmed.

The trial court found that the reliability of Michael Beatty, upon whose statement the police relied in making the arrest, had not been established, and that neither his statement nor other information relied on by the police provided probable cause to arrest. The majority reverses, holding that the suppression court's findings are not supported by the record. I cannot agree.

The standard for review of suppression orders is set out in *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976), a case in which the suppression court decided questions of fact in favor of the prosecution:

> "The suppression court, which hears and evaluates the testimony, is required to make findings of fact and conclusions of law. . . . Our responsibility on review is 'to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings.' In making this determination, this Court will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted."

Id. at ——, 361 A.2d at 290 (Citations omitted). Necessarily, the same standard of review applies when the defense prevails at the suppression hearing: findings of fact and the legitimacy of the inferences drawn from those findings, viewed in the light most favorable to the defendant, must be sustained if supported in the record. It makes no difference that the Commonwealth's evidence, standing alone, could support an opposite result. Moreover, it is within the province of the suppression court to determine the credibility of the witnesses. *Commonwealth v. Bruno*, 466 Pa. 245, 255, 352 A.2d 40, 45 (1976).

The majority today simply ignores these well established principles and proceeds to assume the role of a fact finder.

When the majority claims that "[t]o permit the lower court's decision to stand would unduly hamper law enforcement," I can only conclude that the majority believes that it is an abuse of discretion for a suppression court to refuse to adopt the prosecution's version of the facts and version of the inferences that should be drawn from those facts.[1]

The record fully supports the suppression court's conclusion that Beatty was not reliable. Beatty had already given an inconsistent statement to Detective Porter. The court heard testimony from Beatty and Porter and, based on the court's evaluation of their testimony, determined that Beatty was not a reliable informant. The majority, however, ignoring the trial court's findings, states that Beatty's statement was reliable because it was in accord with statements given by others to Detective Porter. The majority concludes that Beatty's statement, together with these other statements, established probable cause.

Yet, the other statements accusing appellant of the killing were, as the majority admits, "neighborhood

---

1. The majority states that the four cases relied on by the suppression court do not support its result because "they are not factually similar to the instant case." However, it fails to recognize the distinct procedural posture of this case. In all four of those cases, this Court reversed a suppression court's determination that probable cause existed. *Commonwealth v. Bailey*, 460 Pa. 498, 333 A.2d 883 (1975); *Commonwealth v. Daniels*, 455 Pa. 552, 317 A.2d 237 (1974); *Commonwealth v. Jeffries*, 454 Pa. 320, 311 A.2d 914 (1973); *Commonwealth v. Mamon*, 449 Pa. 249, 297 A.2d 471 (1972). In each case this Court applied the limited standard of appellate review, accepting all of the Commonwealth's evidence, including the credibility of its witnesses, as true. The same benefit accorded the Commonwealth's evidence in those cases must be given to appellant's evidence here. The majority's analysis effectively denies appellant the same evidentiary benefit afforded the Commonwealth when it successfully opposes a defense motion to suppress evidence.

gossip." [2] The suppression court properly concluded that this gossip was also unreliable and insufficient either to establish Beatty's reliability or to establish probable cause independently. This Court is bound by the suppression court's finding because it is fully supported in the record. Thus, there is no probable cause for appellant's arrest because there is no "reasonable trustworthy information . . . sufficient to warrant a prudent man in believing that the [defendant] has committed . . . an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145 (1964).

The suppression court found that appellant was illegally arrested. That finding is supported in this record. Its order suppressing appellant's statements should therefore be affirmed.

MANDERINO, J., joins in this dissenting opinion.

---

2. The majority relies extensively on the testimony of one witness. See Majority Opinion at n. 2. This witness concluded that appellant was responsible for the killing because a girl in the neighborhood, who did not see the killing, blamed it on the appellant, and because he did not answer when the witness asked him if he was responsible. It does not follow that because hearsay is admissible at suppression hearings that the reliability of these statements is conclusively established. Nor is the trial court required to adopt the same inferences as the witness. The record adequately supports the trial court's finding that this highly dubious testimony was not sufficiently reliable to establish probable cause. When the majority relies on this testimony to overturn the suppression order it ignores the proper scope of appellate review and substitutes its findings of fact for those of the trial court.