Timothy SCHELL

v.

**Raymond GUTH and Corporal Francis J. Barrett, Appellants.**

Commonwealth Court of Pennsylvania.

Argued Dec. 9, 2013.

Decided March 19, 2014.

Reconsideration/Reargument En Banc Denied May 7, 2014.

Claudia M. Tesoro, Senior Deputy Attorney General, Philadelphia, for appellants.

Eric E. Winter, Bechtelsville, for appellee.

BEFORE: LEAVITT, Judge, BROBSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge BROBSON.

By Order dated June 19, 2013, we granted the petition of Appellants Raymond Guth (Guth) and Francis J. Barrett (Barrett) (collectively, Appellants), accepting for immediate appellate review an interlocutory order of the Court of Common Pleas of Berks County (trial court), which denied Appellants' motion for summary judgment as to the claims set forth in the Second Amended Complaint (Complaint) of Plaintiff/Appellee Timothy Schell (Schell). *See* Pa. R.A.P. 1311 and note. In doing so, we agreed to consider whether Schell's tort claims of malicious prosecution, defamation/false light, intentional infliction of emotional distress, and negligence against Appellants are barred by sovereign immunity. Because we conclude that neither the facts Schell alleges nor the evidence of record would support a finding that Guth and Barrett acted outside of the scope of their employment, Schell's tort claims are barred by sovereign immunity. We, therefore, will reverse the trial court's order and remand with instructions that the trial court enter judgment in favor of Appellants.

**STANDARD OF REVIEW**

This Court's standard of review of a denial of summary judgment is limited to determining whether the trial court committed an error of law or abused its discretion. *Mason & Dixon Lines, Inc. v. Mognet,* 166 Pa.Cmwlth. 1, 645 A.2d 1370, 1372 n. 2 (1994). Our scope of review is *de novo* when we consider questions of law. *Weaver v. Lancaster Newspapers, Inc.,* 592 Pa. 458, 465, 926 A.2d 899, 902–03 (2007). A court may grant a motion for summary judgment only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Farabaugh v. Pa. Tpk. Comm'n,* 590 Pa. 46, 52, 911 A.2d 1264, 1267 n. 3 (2006). The right to judgment must be clear and free from doubt. *Fine v. Checcio,* 582 Pa. 253, 265, 870 A.2d 850, 857 (2005). In reviewing the denial of a motion for summary judgment, this Court must view "the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Id.,* 870 A.2d at 857.[1]

On summary judgment, the moving party must demonstrate that there is no genuine issue of fact regarding any element of an issue for which the moving party bears the burden of proof at trial. *See Limbach Co. v. City of Philadelphia,* 905 A.2d 567, 572 n. 7 (Pa.Cmwlth.2006). In this case, Appellants, who raised the affirmative defense of sovereign immunity, had the burden as the moving party to show that there is no material issue of fact remaining relative to the "scope of employment" question. When the evidence on a particular factual question is such that a reasonable jury could return a verdict for the non-moving party, a material fact will be found to exist. *See Taylor v. Jackson,* 164 Pa.Cmwlth. 482, 643 A.2d 771, 776 (1994). When a moving party proffers evidence indicating that a certain fact exists, the

---

1. The trial court did not include in its order, or in a supporting opinion, the basis for its decision to deny Appellants' motion for summary judgment. *See* Pa. R.A.P. 1322, 1925(a). We, therefore, analyze the merits of the ruling without the benefit of the trial court's rationale.

non-moving party must point to evidence in the record indicating that a conflict in the evidence warrants review by the fact finder. *Myers v. Penn Traffic Co.,* 414 Pa.Super. 181, 606 A.2d 926, 928 (1992), *appeal denied,* 533 Pa. 625, 620 A.2d 491 (1993). Also, "a record that supports summary judgment will either (1) show the material facts are undisputed or (2) contain insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the jury." *Lineberger v. Wyeth,* 894 A.2d 141, 146 (Pa.Super.2006).

Here, Appellants moved for summary judgment following discovery. Appellants supported their motion with twenty-one exhibits, consisting of deposition testimony excerpts and exhibits. (Certified Record (C.R.) # 19, Exhibit Binder.) Appellants also relied to a more limited extent on the parties' pleadings. Appellants' brief in support of their motion included a detailed statement of undisputed facts. (*Id.,* Brief in Support at 2–21.) In his brief in opposition, Schell mostly agreed with Appellants' statement. (C.R. # 25, Brief in Opposition at 6.) To some extent, however, he relies on additional deposition testimony and averments in his Complaint to support his argument that the case should proceed to trial. *See* Pa. R.C.P. No. 1035.3(a) (providing that in responding to motion for summary judgment, "the adverse party may not rest upon the mere allegations or denials of the pleadings").

### UNDISPUTED MATERIAL FACTS

Based on our review of the parties' papers in support and in opposition to summary judgment, the following material facts are undisputed.

Schell graduated from the Pennsylvania State Police (PSP) Academy on or about December 18, 1991, and, thereafter, served as a trooper with the PSP until his dismissal in January 2009. At the time of his dismissal, Schell had attained the rank of corporal and served as the Staff Unit Supervisor at the Reading Barracks of PSP, which is the headquarters for PSP Troop L.[2] At no point in his career with PSP did Schell work in either a criminal investigations unit or internal affairs.

At all times relevant to the Complaint, Guth and Barrett also served as troopers with PSP. Guth was a sergeant and served as the Criminal Investigations Section Supervisor for Troop L. In this capacity, Guth's job duties included the investigation of various crimes, including crimes that may have been committed by fellow PSP employees. Guth, like Schell, was based in the PSP's Reading Barracks. Guth and Schell knew each other but did not have any relationship beyond the workplace.

Schell's dismissal from PSP followed both criminal investigations and investigations by the PSP Internal Affairs Division (IAD) into Schell's separate and unrelated interactions with a minor female, R.T., and an adult female, J.S. Barrett, a corporal assigned to IAD and stationed in Harrisburg, conducted the IAD investigations, and Guth conducted the criminal investigations. Schell and Appellants acknowledge some overlap and cooperation between the IAD and criminal investigations, as they both looked into the same alleged inappropriate conduct by Schell. As Schell acknowledges in both his Complaint and his brief on appeal, the alleged wrongful conduct of Appellants in this case occurred while both were acting in their capacities as troopers.

### A. R.T.

With respect to R.T., a friend of R.T., O.K., reported alleged inappropriate con-

---

**2.** Troop L encompasses five barracks within a three county area.

tact between Schell, then 37 years old, and R.T. to a school guidance counselor, who referred the matter to Berks County Children and Youth Services (CYS). Eventually, the matter came to the attention of Guth's supervisor, Lieutenant (Lt.) Bernot, who, on January 11, 2007, advised Guth of the allegation and assigned Guth to investigate the matter for criminal conduct. Guth's report of his investigation into the allegations is included in the record in support of Appellants' motion for summary judgment. (Reproduced Record (R.R.) at 179a–247a.)

Several additional noteworthy things happened that same day. Lt. Bernot placed Schell on restricted duty status and directed him not to have any contact with R.T. Guth spoke with both the guidance counselor and R.T.'s father. The next day, January 12, 2007, Guth interviewed R.T. During the interview, R.T. recounted how she came to meet Schell in early 2006 through her father. She described how she enjoyed job-shadowing Schell in February 2006 and how she attended "Camp Cadet," a week-long summer camp, at his suggestion. Schell was a counselor at the camp. She explained how she saw Schell on a regular basis at the "GoggleWorks" in Reading, where R.T.'s sister and Schell's daughters attended classes together. She also indicated that they would sometimes speak by phone.

R.T. told Guth how she and Schell usually hugged to greet each other. With respect to the incident reported by her friend to the guidance counsel, R.T. said that the hug occurred in an empty stairwell and that Schell was attempting to comfort her because she was upset over a family member. R.T. denied that the hug was at all sexual in nature and that Schell

touched her buttocks. Following the interview of R.T., Guth spoke with R.T.'s parents outside of her presence. During that conversation, the parents indicated that Schell appeared to be a positive influence on their daughter's life, but that they had become worried about the relationship. One of R.T.'s cousins also had expressed some concern about the relationship. R.T.'s parents gave Guth access to R.T.'s cellular telephone, but the phone had limited useful information. Specifically, it does not appear that any text messages between R.T. and Schell were preserved on the telephone. R.T.'s father later provided records for the phone for the period September 26, 2006, through December 18, 2006. These records revealed thirty-nine text messages and eight phone calls between R.T. and Schell's cellular telephone. But again, copies of the actual messages were not available.

On January 17, 2007, Guth spoke with O.K.[3] O.K. relayed to Guth details of conversations that she had with R.T. about her relationship with Schell. In some of those conversations, R.T. expressed romantic feelings toward Schell. She also showed O.K. text messages from Schell. On January 5, 2007, R.T. showed O.K. a text message string that included the following exchange:

> Schell: So, did you like your hug?
>
> R.T.: Hell yeah!
>
> Schell: Well, next time, don't bring your books and I will give you more.

O.K. recounted that R.T. was excited to see Schell after receiving this text. R.T. relayed how the night before, Schell told R.T., when they were alone, that "I want my hug," or "Don't I get a hug." After that, Schell hugged R.T., during which he

---

**3.** Guth's record of his conversation with O.K. is set forth at pages 8 and 9 of his investiga-
tive report. (R.R. at 188a–89a.)

rubbed R.T.'s back and touched, or "tapped", her buttocks. R.T. also told O.K. that during the hug she could feel Schell's erect penis against her body. Following the interview, Guth spoke with the guidance counselor again, who expressed her belief that O.K. was a credible witness.

On January 19, 2007, Guth spoke with two troopers who had been staffing a D.U.I. checkpoint on an evening in October 2006. R.T.'s father had dropped R.T. off at the checkpoint, leaving her in Schell's care. Both troopers recalled R.T. being on-site at the checkpoint. One recalled how Schell instructed him to drive R.T. home after the checkpoint ended. Guth also spoke with another trooper who recalled R.T. doing the job shadow with Schell and attending Camp Cadet. This trooper did not observe any unusual behavior between R.T. and Schell.

On January 23, 2007, Guth spoke with G.F., another friend of R.T.'s. Consistent with O.K., G.F. relayed a conversation she had with R.T. about her romantic feelings toward Schell and how he "tapped" her buttocks during a hug. That same day, Guth confirmed that there were no security cameras in the stairwells at the Goggle-Works, where the alleged inappropriate touching occurred.

On January 24, 2007, Guth spoke with two Camp Cadet counselors. One had no noteworthy information. The other, a Reading Police Officer (Reading Officer) relayed a recent conversation that he had with a junior counselor. During that conversation, the junior counselor told the Reading Officer that R.T. called her and told her that a girl at school who did not like R.T. reported Schell to a school counselor. R.T. denied that there had been

any inappropriate contact between her and Schell.

On February 2, 2007, Schell surrendered his personal cellular phone to Guth without incident after being presented with a warrant. Schell would not respond to Guth's questions about R.T. Guth asked Schell how long he had had the phone and whether it had been altered. Schell responded that he had it for one or two years and would not know how to alter it. An examination of Schell's cellular phone revealed no recent activity. Guth used a third-party software to examine the phone's SIM (subscriber identity module) card. The report generated by the software revealed twenty-three entries for the SIM card of "sms_cleared."[4] (R.R. at 204a.)

On February 9, 2007, Guth spoke with another friend of R.T.'s, N.R. N.R. relayed to Guth what R.T. told her about her relationship with Schell. Consistent with G.F. and O.K., N.R. relayed how R.T. had a "little crush" on Schell. She too also recounted seeing a text message between Schell and R.T. about a hug. According to Guth's report, N.R. recounted the exchange as follows:

Schell: You miss me?

R.T.: Yes

Schell: Did you like my hug?

R.T.: Yes.

Schell: Don't bring anymore damn books and you'll get more.

R.T.: Ok

(R.R. at 212a.)

On February 9, 2007, Guth again met with R.T. and her parents. During this meeting, Guth expressed concerns to R.T. that she was not truthful during their earlier meeting. R.T. then agreed to tell Guth what happened between her and

---

**4.** According to *www.dictionary.com* (last visited Jan. 29, 2014), a SIM card is "a removable card inside a cell phone that stores data unique to the user, as an identification number, passwords, phone numbers, and messages."

Schell on January 4, 2007. Consistent with the information Guth had received from R.T.'s friends, R.T. told Guth about the incident. She filled out her own victim/witness statement on February 19, 2007. R.T.'s statement provides in relevant part:

> I arrived at the GoggleWorks at approx. 1655 hours, Thurs. evening. We went to the fourth floor to drop off . . . my little sister for her class. [M]y mother[ ] stayed in [my sister's] classroom because the teachers were conducting a period of classroom observation. Tim and his two children were already in the fourth floor waiting area. We proceeded to go down to the ground floor, where the café area was located. They got something to eat and I proceeded to study and catch up on my homework. We were on the ground floor for approx. 45 min. After they were finished eating, the kids took the stairs to return to the fourth floor for . . . class. They started ahead of us and eventually Tim and I were alone in the stairway. He had his hand located on the back of my neck as we ascended the stairs. When we reached the third floor he turned me towards him and we hugged. He stopped and told me my books were in the way. This was a reference to a running joke between him and I. I told him that I could set my books down. He considered this for a brief period and then agreed. I proceeded to set my books, jacket, and purse on the floor and he set down a can of soda he had been carrying. We proceeded to hug. At one point I rubbed my pubic area against his. He did not rub against me at any point in time. He reciprocated by brushing his left hand over my buttocks. He then spanked my buttocks in the same manner. The hug was mutually ended at that point. He said nothing afterwards and we did not dis-

cuss the incident at any point. Afterwards we reached the fourth floor. We proceeded to the waiting area and conversed until approx. 1910 hours. At that point . . . my father picked me up and took me to RCIA. Tim and I left at approx. the same time. The following day I was in the locker room of my school changing for my workout when Tim text messaged me. The first message read "Did u like ur hug." I replied "Hell yeah," second guessed myself, and sent "Keep up the good work." He sent "Don't carry books and u will get more." I did not know what to make of that. I assumed he was referring to kissing, as sex seemed too big of a leap at the time. I replied "OK-that's powerful incentive." A few minutes later he sent "Miss me" and I relied "Of course." All the messages were from the same phone number. That was the last time I had contact with him.

(R.R. at 248a–50a.)

On March 27, 2007, Guth interviewed R.T.'s cousin, R.P. R.P. told Guth what she knew about R.T.'s relationship with Schell. R.P. said that she thought it was "weird" that Schell would be text messaging and calling R.T. She told R.T.'s mother about it. She also remembered seeing a text message from Schell to R.T., which Schell ended with "XOXO," also referring to it as "weird".

On April 11, 2007, Guth contacted Schell's lawyer to determine whether Schell would give a statement. The attorney refused to make Schell available. Guth then attempted to reach Schell's wife at her place of work to discuss what she might know about Schell's relationship with R.T. Schell's wife refused to speak to Guth.

**B.  J.S.**

In March 2007, a civilian employee at PSP Reading Barracks relayed to Guth

that a friend of hers, J.S., had some troubling contact with Schell in the past. At this time, Guth was investigating the R.T. matter. Guth decided on his own to follow-up with this information from the civilian employee. His investigation is detailed in a separate report, which Appellants include in the record in support of their motion for summary judgment. (R.R. at 287a–98a.)

Guth contacted J.S. According to the investigative report, J.S. explained that on two occasions in May 2006, she drove to the Reading Barracks for assistance in installing a child car seat. Schell installed the seats each time. When J.S. arrived home the second time, Schell had left a message on her answering machine, asking her to call him back because he forgot to copy some numbers off of the car seat that he installed. She noted that Schell had called from his cell phone, because he left his cell phone number on the paperwork he gave her after installing the seat. J.S. called Schell's cell phone from her cell phone. During the call, Schell apparently attempted to engage in conversation about matters unrelated to the car seat and his duties as a Trooper. Schell apparently went so far as to suggest that the two should get together for lunch. Believing that Schell was hitting on her, J.S. ended the call. A day or two later, J.S. received a text message from Schell's cell phone, with the message "Hi." J.S. did not realize it was Schell at the time and ignored it. The next day, she received the same message from the same number. She retrieved the paperwork from the car seat installation and confirmed that the texts came from Schell's cellular telephone.

Upset, J.S. told her friend who worked at the Reading Barracks about the incident, but took no further action.

Guth conducted a formal, recorded interview of J.S. on June 14, 2007. During this interview, J.S. confirmed the events as recounted in her earlier discussion with Guth. J.S. provided copies of her cellular phone records, confirming the call with Schell and the text messages from Schell. PSP records indicate that the day after he installed the second car seat, Schell accessed JNET[5] and ran searches on J.S.'s photo and driver's license information.

### C. Criminal Charges

In June 2007, Guth submitted his two investigative reports regarding the R.T. and J.S. matters, along with proposed criminal charges, to the Office of the Berks County District Attorney. On June 26, 2007, the District Attorney approved all charges. On July 2, 2007, Guth filed the approved charges against Schell with respect to both the R.T. and J.S. matters. (R.R. at 274a–80a (R.T.), 300a–04a (J.S.).) Guth supported the police criminal complaints with affidavits of probable cause.

In his police criminal complaint with respect to R.T, Guth accused Schell of violating 18 Pa.C.S. § 6301(a)(1) (relating to corruption of minors), 18 Pa.C.S. § 3126(a)(8) (relating to indecent assault), and 18 Pa.C.S. § 6318(a)(1) (relating to unlawful contact with a minor), all misdemeanors. The first two charges related specifically to the alleged incident in the stairwell, where Schell was accused of initiating an intimate hug with R.T., during which his genital region touched hers, he rubbed her back,

---

5. The Pennsylvania Justice Network, or JNET, is "the Commonwealth's system of providing immediate justice information to law enforcement agencies [and] is designed to insure accuracy of information and facilitate the dissemination of this information in a timely and electronic manner." *Commonwealth v. Carr*, 887 A.2d 782, 783 (Pa.Super.2005); *see Pennsylvania Justice Network, Pa. Office of Admin.*, *www.pajnet.state.pa.us* (last visited Feb. 20, 2014).

and he touched her buttocks. The charge of unlawful contact related specifically to his alleged communication with R.T. the day after, during which Schell was accused of asking R.T. if she liked the hug and then, when she responded in the affirmative, telling her that if she did not bring her books the next time she would get more.

In his police criminal complaint with respect to J.S., Guth accused Schell of violating 18 Pa.C.S. § 7611(a)(2) (relating to unlawful use of a computer and other computer crimes), a felony, and 18 Pa.C.S. § 2709.1(a)(1) (relating to stalking), a misdemeanor. The computer crime charge related to Schell's alleged unofficial and thus unauthorized use of JNET to find information about J.S. The stalking charge related to Schell's alleged invitation to J.S. to join him for lunch, his subsequent text messages to her, and his use of the JNET system to find additional information about her.

Pursuant to an arrest plan that he devised, Guth, aided by other troopers, arrested Schell when he reported to work on June 3, 2007. Schell did not resist arrest. It is undisputed that in the course of the arrest, Schell was placed up against a wall to be handcuffed. There is, however, a dispute over the amount of force used to place Schell against the wall. Schell maintains that he was pushed up against the wall two times with such force that he suffered an injury to one of his rotator cuffs, which required surgery. Guth disputes Schell's version of the events.

On August 8, 2007, Schell appeared before a magisterial district judge (MDJ) for a preliminary hearing on all criminal charges. The Commonwealth of Pennsylvania was represented by the District Attorney. Following the preliminary hearing, the MDJ dismissed the charges with respect to the J.S. matter. The MDJ, however, held over for trial all charges with respect to the R.T. matter. At a pretrial hearing on January 1, 2008, the trial court dismissed all but the indecent assault charge. On February 13, 2008, following a bench trial, the trial court found Schell not guilty of the indecent assault charge.

### D. Internal Affairs and Discipline

#### 1. R.T. Matter

On the same day she assigned Guth to conduct a criminal investigation into the relationship between Schell and R.T., Lt. Bernot initiated an internal, administrative investigation into the matter by filing a complaint with IAD. (R.R. at 436a–37a.) The next day, January 12, 2007, PSP Lt. Michael A. Patrick, Supervisor, IAD, Bureau of Integrity and Professional Standards, assigned Barrett to investigate.[6] However, because there was a pending criminal investigation regarding the same conduct, Barrett followed standard PSP procedure and did not move forward with his investigation until the criminal proceedings against Schell concluded. It is undisputed that Barrett communicated with Guth at various times during the course of the criminal investigation and that Guth kept Barrett abreast of developments in the investigation. Barrett also followed the course of the criminal prosecution, attending the preliminary hearing, pretrial hearing, and bench trial. He also obtained a copy of the criminal trial transcript, attaching it to his final General Investigation Report.

Following the verdict, upon learning that R.T. had additional information that she wanted to share about her interactions

---

**6.** Barrett's General Investigation Report of the R.T. matter is included in the record in support of Appellants' motion for summary judgment. (R.R. at 412a–93a.)

with Schell, Guth and Barrett conducted a recorded interview of R.T. on February 29, 2008. During this interview, R.T. related several incidents where Schell engaged in what could be described generally as suggestive banter. She also recalled how Schell also complained to R.T. about his wife on one occasion, spoke to R.T. about his upbringing and reason for becoming a trooper, and discouraged R.T. from doing her homework when they spent time together at the GoggleWorks. Schell also liked staying in touch with R.T.

R.T. also relayed an instance at the GoggleWorks when Schell did not hug R.T. because Schell's wife was present. When she left to get food, however, R.T. recalled that Schell rubbed his foot on her leg under the table. She recalled additional instances where Schell would place his hand on her back and massage her neck. She also recalled again the instance at the GoggleWorks in January 2007, where they hugged in the stairwell and he touched her buttocks as she rubbed her groin area up against his.

On March 26, 2008, Barrett, accompanied by another trooper, interviewed Schell, who was accompanied by counsel. The interview was recorded. During the interview, Schell provided his summary of his relationship with R.T. He spoke about problems R.T. had with an eating disorder and relationships with her family members. He spoke of how he tried to help her. They exchanged cellular phone numbers after Camp Cadet and kept in touch by calls and texts. They also exchanged photographs. According to Schell, R.T.'s father asked if R.T. could attend a D.U.I. checkpoint. Schell said he asked his supervisor, Sergeant Yankowsky, if R.T. and her father could be present for the checkpoint. According to Schell, Sergeant Yankowsky indicated that it should not be a problem.

Schell said that the father left early, but R.T. stayed. He asked another trooper to take R.T. home. The next day, he spoke to the trooper. According to Schell, the trooper indicated that R.T. did not want to get out of the car and that he felt uncomfortable, like R.T. was waiting for him to "make a move."

Schell and R.T. continued to keep in contact, texting approximately once a week. Schell maintained that his wife knew about the whole situation. He admitted to sending texts to her that included the words "miss ya," or similar phrases. He contended that it was simply a way to indicate that he was there for her. He acknowledged possibly sending her a Christmas text with "xoxo," which Schell said meant hugs and kisses. He said, however, that he sent that text to another person as well. According to Barrett's report, the other person was a 27-year-old married female, C.C., who, during an interview by Guth and Barrett, admitted to having an affair with Schell. Schell, however, denied having any intimate relationship with C.C. He acknowledged that sending a text to a minor female with "xoxo" in it could be inappropriate, but it depended on the situation. He said that in his eyes, at the time, there was no problem.

Schell indicated that he and R.T. hugged hello and goodbye. He denied touching R.T. under the table with his leg, though they may have accidentally touched feet under the table. He characterized R.T. as being "mentally disturbed." Schell said he patted her back during a hug, but did not rub her back. He indicated that it is possible that he may have asked R.T. at one point to "come and get your hug," indicating that it would be for purposes of saying goodbye. He denied giving her a neck massage, but may have given her neck a little squeeze once or twice.

Schell also gave his version of the encounter in January 2007 that gave rise to the criminal charges. He said that day at the GoggleWorks R.T. was visually upset about her family situation. When it was time to go upstairs to his daughters' dance class, they walked up the stairs and he said: "You are really upset, when was the last time your dad gave you a hug." R.T. responded that she did not remember. He then said it looked like she could use a hug. R.T. responded that her books were in the way, but that she could put them down. Schell said he hesitated for a moment. He put his drink down and she put her books down. He said he bent over and hugged her under her armpits, being very careful not to make contact with her midriff area. He said he patted her three times on the back and told her everything would be alright. As he pulled away, he said she clinched her upper body. He then forcibly pulled away and, in the process, brushed her hip. Though Schell did not remember being so careful in previous hugs with R.T. in the stairwell, he maintained that he was always sure to make certain it was just a hug and could not be misconstrued.

Schell also complained about Guth during the interview. He believes that Guth questioned R.T. until she changed her story. He said Guth had a reputation that he would go after you if he had a vendetta against you. He said Guth was upset because he did not find any evidence against Schell. He claimed that Guth violated his civil rights on three occasions. He claimed that one time, when his attorney was speaking to another trooper, Trooper Hess, by phone, Guth grabbed the phone from the trooper and asked the lawyer when Schell would talk to him.

With respect to things that R.T. told her friends about her feelings toward Schell and how Schell would get aroused, Schell explained that he believed that R.T. fantasized about being with police officers and it was nothing more than a fifteen year old bragging to her friends and embellishing stories. He said he was only trying to help her, but that he now sees how everything looks and that he exercised poor judgment. He was trying to help her out like a father, a mentor, but that is all.

He admitted texting her the day after the incident that led to the criminal charges. Looking back on the content, he admitted that he exhibited poor judgment in a lot of things he said to her. He said he was just trying to help out, but that, looking back, "it looks bad." He denied altering his cellular phone, admitting only that he either replied or deleted texts after he read them. He admitted to deleting R.T.'s phone number after he was told by Lt. Bernot not to have any contact with R.T. Schell further spoke of what he acknowledged as being poor judgment, but nothing more.

On April 25, 2008, Barrett contacted Sergeant Yankowsky about the evening of the D.U.I. checkpoint. He told Barrett that he did not give Schell permission to bring civilians to the D.U.I. checkpoint. On April 28, 2008, Barrett spoke to Trooper Hess. When asked whether at any point during his telephone conversation with Schell's lawyer Guth pulled the phone out of Trooper Hess's hand, Trooper Hess responded "no."

On April 25, 2008, Barrett interviewed Guth about Schell's claims that Guth had a vendetta against Schell and forced R.T. to change her story to get Schell in trouble. Guth denied any vendetta. To the contrary, Guth said that upon learning of the alleged incident in January 2007, CYS wanted to remove immediately Schell's children from his home. Guth and Lt. Bernot intervened, telling CYS that, at that point, there was nothing more than an

allegation of inappropriate conduct and nothing to indicate that his children were at risk of harm. He said he worked from time to time with Schell and that they were cordial. He said he never had a problem with Schell and thought he did a good job. He would have preferred not to have arrested Schell because he was a fellow trooper and he wanted to avoid any embarrassment to PSP. He said this was something Schell brought on himself.

He denied grabbing a phone out of Trooper Hess's hand. He said that even while the criminal investigation was ongoing, he would pass Schell in the halls of the Reading Barracks and say hello. He had no problems speaking to him about work when necessary. He insists that he only wanted R.T. to tell the truth. After the initial interview, when he spoke with others about R.T. and Schell, he came to believe that R.T. was not truthful in the initial interview. He said that he documented everything about his investigation. He came to believe strongly that Schell should not be a trooper, because he made some very bad choices that were criminal or, at least, immoral. His actions put PSP in a very bad light. There was enough evidence to bring criminal charges. Other things they discovered in his past showed a pattern of bad choices.

Barrett submitted his General Investigation Report of the R.T. matter to his supervisors in May 2008. The report included, *inter alia*, Guth's report on his criminal investigation of the R.T. matter. The report did not include a recommendation of discipline or opinion with respect to whether Schell violated any PSP rules.

### 2. J.S. and Other Contacts

In April 2007, while conducting his criminal investigation of Schell, Guth initiated an internal, administrative investigation into the J.S. matter by filing a complaint with IAD. (R.R. at 610a–11a.) On April 12, 2007, Lt. Patrick assigned Barrett to investigate the complaint.[7] In addition to the J.S. matter, Guth's IAD complaint identified three other incidents of possible stalking and harassment by Schell. The first involved a female trooper, T.C., when she was a probationary trooper. The second involved possible harassment and stalking of another trooper's (N.S.) wife. And the third involved alleged harassment and stalking of a police communications officer (PCO), L.G. (*Id.* at 611a.)

On April 30, 2007, Barrett interviewed PCO L.G. L.G. stated that shortly after Schell transferred to the Reading Barracks, where she worked, she received a note from Schell, in which he indicated that he had feelings for L.G. and knew that she felt the same way by the way she looked at Schell. L.G. denied having feelings for Schell and, knowing he was married, destroyed the note and ignored him. She stated that Schell never bothered her again.

Barrett interviewed Trooper T.C. on May 1, 2007. According to Barrett's summary of the interview in his report, Schell trained T.C. in 1995 and they formed a friendship. Toward the end of the training, T.C. found a rose and a handwritten note in her personal vehicle. It was from Schell. She was shocked, but did not tell anyone, including her supervisor. She also discovered a four-page handwritten note from Schell in her office mailbox, in which Schell professed his amorous feelings for T.C. T.C. described the letter as "immature" and "high schoolish." It made her very uncomfortable. The day after T.C. saw Schell and his wife at a softball game,

---

7. Barrett's General Investigation Report of the J.S. matter is included in the record in support of Appellants' motion for summary judgment. (R.R. at 595a–663a.)

she received another note from him, indicating that his wife saw him staring at her at the game. This made T.C. wonder whether Schell was looking at her that way at work as well. She also received a card from Schell, which she described as an "I miss you card." T.C. ignored the advances and never reported them.

On May 8, 2007, Barrett interviewed Trooper N.S. N.S. recounted how in 1999, while he was having a picnic at his home, he invited two of the on-duty troopers to his home to have some food while they were on their break. Schell joined them. N.S. later found out that Schell spoke to his wife while at the picnic. A few days later, Schell, though not N.S.'s direct supervisor, invited N.S. to work a construction zone. That night, after coming home, N.S. saw his wife in the kitchen cooking hotdogs. N.S. asked his wife why she was cooking the hotdogs. N.S.'s wife told N.S. that Schell had called her and asked her if she had any food left over from the picnic, because he had some hungry guys working at the Reading Barracks. Schell called back later and again asked her about the hotdogs. When N.S.'s wife told Schell that she would have to wait until N.S. came home, Schell told her that she did not have to wait for him. N.S. called Schell about the incident. Schell told him that he was just messing around. N.S. believed that Schell received a disciplinary letter about the incident, but Barrett indicates in his report that he could not verify that a letter had been issued. In addition, Schell denies receiving a disciplinary letter about this incident.

· Barrett accompanied Guth to the formal, recorded interview of J.S. on June 14, 2007, described above. In addition, on June 26, 2007, Guth and Barrett decided to contact other females whose names Schell ran through JNET. On June 27, 2007, Barrett interviewed an adult female, K.M.

K.M. said she knew Schell because they went to the same church when they were children. She recounted how she saw Schell a few years before when she went to a PSP station for a copy of an accident report. She did not give him her telephone number, but she later received a call from Schell on her home phone. K.M. surmised that Schell obtained her telephone number from the accident report. She did not return his call. On June 29, 2007, Barrett interviewed A.L. She indicated that she was from western Pennsylvania and was in the Reading area only once for a football game. She never heard of Schell.

On July 6, 2007, a couple of days after Schell's arrest, Guth told Barrett of another complaint about Schell. Following up, Barrett contacted a married adult female, P.D. P.D. knew Schell from the Goggle-Works. She expressed how Schell would constantly hit on her and wanted to give her a birthday present, which she refused. Schell, however, never said anything inappropriate to P.D. and never touched her in any way. He did give her his business card with his cellular phone number written on the back, but P.D. discarded it.

Finally, on March 28, 2008, Barrett, accompanied by another trooper, interviewed Schell about this particular investigation. Schell recalled a professional coach/pupil relationship with T.C. He recalled that they had a lot in common and that he enjoyed speaking with her. He recalled sending her a note, but did not recall the contents. He did not ask her out on a date. He did not recall a softball game. He denied leaving a rose or note in T.C.'s car. He felt T.C. had him confused with someone else. He did not recall sending her an "I miss you" card.

As for his contact with N.S.'s wife, Schell did not specifically recall attending a picnic. He does recall meeting N.S.'s

wife. He recalled that she used to bring food to the station for N.S. and that he recalled asking her to bring food in for the rest of them.

He recalled installing car seats for J.S. on a couple of occasions. He stated that a lot of people request him to install car seats and that some refer to him as the "car seat guru." He writes his personal cellular telephone number on the receipts given after installation. He recalled using the phone number on a checklist to call J.S., because he had failed to obtain certain information about the car seat. When she called him back, she had questions about car seats and traffic issues. Because they knew each other and had spoken about their families, Schell told her that if she was ever in the area, she should stop by and they could grab lunch and talk about their girls. At this point, J.S. said she had to make dinner for her husband and hung up. He denied having subsequent contact with her. With respect to the text messages, he did not know whose telephone number he was texting. The purpose of sending the text was to find out whose number it was. As for accessing JNET, he said he used it to put a name to a face.

As for the other uses of JNET, he indicated that he accessed the system on a couple of connections at the direction of Sergeant Yankowsky, to vet candidates for a greeter position. In a subsequent interview with Barrett, Sergeant Yankowsky stated that Schell took it upon himself to run the JNET search. Schell did not remember A.M. As for K.M., Schell stated that he remembered running her name through JNET, but could not recall why.

As for P.D., Schell recalled that he may have spoken to her at the GoggleWorks, but he did not recall the name. He did not recall anything about a birthday or birthday present. With respect to his contact with former PCO L.G., Schell noted that they dated in high school and that he also dated one of her friends. He said that he once gave her a note, asking to go out to dinner sometime. He offered to talk to her and help her through some problems she was having with her ex-husband.

Barrett submitted his General Investigation Report of the J.S. matter to his supervisors in May 2008. The report included, *inter alia*, Guth's report on his criminal investigation of the J.S. matter. The report did not include a recommendation of discipline or opinion with respect to whether Schell violated any PSP rules or recommendations.

### 3. Termination

By formal written action of July 10, 2008, Schell was dismissed from the PSP. (R.R. at 838a–45a.) In that document, the PSP found that Schell violated eight PSP Field Regulations with respect to his dealings with R.T. Schell appealed the dismissal, and an arbitrator upheld the dismissal.

### DISCUSSION

■ "Generally, sovereign immunity protects Commonwealth officials and employees acting within the scope of their duties from civil liability." *Kull v. Guisse*, 81 A.3d 148, 154 (Pa.Cmwlth.2013). This protection extends to claims for intentional torts. *Id.* at 157. The General Assembly has specifically reaffirmed the sovereign immunity of the Commonwealth and its employees, providing:

Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and *employees acting within the scope of their duties,* shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General

Assembly shall specifically waive the immunity.

1 Pa.C.S. § 2310 (emphasis added). The General Assembly has also waived sovereign immunity in certain limited situations involving the negligence of a Commonwealth official or employee. 42 Pa.C.S. § 8522.

■ In *La Frankie v. Miklich*, 152 Pa. Cmwlth. 163, 618 A.2d 1145 (1992) (en banc), we observed:

> [T]he proper test to determine if a Commonwealth employee is protected from liability pursuant to 1 Pa.C.S. § 2310 and 42 Pa.C.S. § 8522 is to consider whether the Commonwealth employee was acting within the scope of his or her employment; whether the alleged act which causes injury was negligent and damages would be recoverable but for the availability of the immunity defense; and whether the act fits within one of the nine exceptions to sovereign immunity.

*La Frankie*, 618 A.2d at 1149. On the other hand, if a defendant who is a Commonwealth employee was not acting within the scope of employment, he cannot claim the affirmative defense of sovereign immunity. In *Sanchez v. Montanez*, 165 Pa. Cmwlth. 381, 645 A.2d 383 (1994), we identified the applicable criteria to resolve scope-of-employment issues as follows:

> Conduct of an employee is within the scope of employment if it is of a kind and nature that the employee is employed to perform; it occurs substantially within the authorized time and space limits; it is actuated at least in part, by a purpose to serve the employer; and if force is intentionally used by the employee against another, it is not unexpected by the employer.

*Id.*, at 388 (quoting *Natt v. Labar*, 117 Pa.Cmwlth. 207, 543 A.2d 223, 225 (1988)). These criteria mirror those contained in Section 228 of the Restatement (Second) of Agency, and we will apply those standards here.

■ Having reviewed the extensive record on summary judgment under the standards set forth above governing both summary judgment and sovereign immunity, Guth and Barrett have met their burden of establishing both the lack of any genuine issue of material fact and their entitlement to the defense of sovereign immunity as a matter of law. Schell concedes in his Complaint that all conduct that forms the basis of his Complaint occurred during the time that Guth and Barrett were PSP employees. (R.R. at 9a.) Both Guth and Barrett followed orders and acted within the scope of their assigned duties with PSP. Specifically, Guth, as Criminal Investigations Section Supervisor for Troop L, investigated alleged criminal conduct of Schell in his dealings with both R.T. and J.S. Barrett, as a trooper assigned to IAD, was tasked by his supervisor with conducting an internal administrative investigation into the same conduct. Guth ultimately completed two criminal investigative reports and filed criminal charges against Schell with respect to both the R.T. and J.S. matters. Barrett ultimately completed his IAD reports and submitted them to his supervisor.

Based on the foregoing undisputed material facts, and because Schell fails to include any argument in his brief, let alone a citation to record evidence, upon which any reasonable jury could conclude that Barrett acted outside of the course and scope of his employment with respect to his investigation of Schell, all of Schell's claims against Barrett are barred by sovereign immunity. Schell's tort claims are clearly directed at events surrounding the criminal investigation, his arrest, and the prosecution of charges against him. Although Schell generally asserts those

claims against Guth *and Barrett,* our review of the record shows no evidence upon which a reasonable jury could conclude that Barrett played any greater role in those events than that of a passive observer, waiting until the conclusion of the criminal proceedings to proceed with and finalize his internal investigations. The trial court, therefore, erred in denying Barrett's motion for summary judgment.

Schell does, however, make certain arguments in his brief on appeal in an effort to support the trial court's decision to deny summary judgment as to his claims against Guth. Specifically, at pages 14 to 15 of his brief, Schell contends:

> [Guth and Barrett] spend an inordinate amount of time in their brief arguing that [they] were State Troopers and were within work hours when this occurred. This has never been disputed. What is presently been suggested and has always been suggested is that [they] took this case and made it personal. Guth ignored exculpatory evidence and the fact that there was not sufficient evidence to charge [Schell] but filed charges anyway. This is not the kind of acts that Guth would have been asked to perform as part of his duties as a trooper. This was not the kind of act that served PSP. Filing criminal charges that cannot possibly be sustained does not serve PSP's interests. Ignoring exculpatory evidence does not serve PSP's interests.

Schell continues with this theme at page 16 of his brief on appeal:

> [Schell] believes that the facts have shown through discovery that Appellants Guth and Barrett were not authorized by the Pennsylvania State Police to:
>
> 1) File charges or make allegations without reasonable suspicion and/or probable cause.
>
> 2) Prosecute a case without full investigation.
>
> 3) File charges in circumstances where there was no admissible evidence to support a finding of probable cause.
>
> . : . . Additionally, Appellants Guth and Barrett were not authorized by the Pennsylvania State Police to:
>
> 1) Cast aspersions on Appellee's character
>
> 2) Violate Appellee's right to privacy,
>
> 3) Repeatedly and unnecessarily publicize the investigation including the false charges against Appellee.
>
> . . . . Additionally, Appellants Guth and Barrett were not authorized to intentionally inflict emotional distress on Appellee . . . and Appellant Guth was not authorized to use force sufficient to injure Appellee's arm. . . .

Schell's arguments, however, are not persuasive for several reasons.

Even assuming these allegations are sufficient to take Guth outside of the scope of his employment, in advancing each of these arguments Schell relies exclusively on the averments in his Complaint. In opposing summary judgment, however, Schell cannot rest on the allegations in his Complaint; instead, he needed to show, by citation to record evidence, a genuine issue of material fact as to each one of these claims. *See* Pa. R.C.P. No. 1035.3(a). Schell simply fails to do this in his brief on appeal. On this basis alone, summary judgment in favor of Appellees would be appropriate. We, however, engaged in an independent examination of the summary judgment record to see if there was any evidence to support Schell's claims, and found nothing.

▮▮▮ As we noted in *La Frankie,* "[p]robable cause is a reasonable ground of suspicion supported by circumstances suf-

ficient to warrant that an ordinary prudent person in the same situation could believe that the party is guilty of the offense. '[P]robable cause is not ... an actual state of guilt.'" *La Frankie*, 618 A.2d at 1148 (alteration in original) (quoting *Neczypor v. Jacobs*, 403 Pa. 303, 308, 169 A.2d 528, 530 (1961)). The undisputed record evidence shows that Guth's criminal investigative reports detailed the scope and findings of his criminal investigation, including incriminating *and exculpatory* evidence. In June 2007, Guth submitted his two investigative reports regarding the R.T. and J.S. matters along with proposed charges to the District Attorney. On June 26, 2007, the District Attorney approved all charges. On July 2, 2007, Guth filed the approved charges against Schell with respect to both the R.T. and J.S. matters. (R.R. at 274a–80a (R.T.), 300a–04a (J.S.).) Guth supported the police criminal complaints with affidavits of probable cause. Contrary to Schell's claim, the affidavit of probable cause with respect to the R.T. charges relies, at least in part, on the statement that the alleged victim, R.T., gave on February 19, 2007, during which R.T. confirmed the events that supported the criminal charges and corroborated the statements of friends and others interviewed as part of the criminal investigation. *See Commonwealth v. Dickerson*, 468 Pa. 599, 608, 364 A.2d 677, 682 (1976) (holding that "hearsay evidence is considered valuable evidence in testing probable cause to arrest"). Similarly, the affidavit for probable cause supporting the J.S. charges was supported in part by the firsthand statement of the alleged victim, J.S.

Accordingly, Schell's contention that Guth filed the criminal charges knowing that he lacked admissible evidence and that he lacked probable cause to file the charges is not supported by the record. That the MDJ dismissed the J.S. charges at the preliminary hearing stage does not mean that Guth acted outside the course and scope of his employment in filing the charges. As for Schell's claim that Guth and Barrett "made it personal," again, Schell fails to cite anything in the record, and we have found nothing, upon which a jury could conclude that Guth and Barrett, in carrying out their duties to investigate Schell, were motivated *solely*, or even partially, by malice, hatred, or ill-will toward Schell and without any purpose to serve PSP, their employer. *Sanchez*, 645 A.2d at 388. There is no evidence that Barrett had any dealings with Schell prior to being assigned to conduct the internal administrative investigations. And although Guth and Schell worked at the same PSP barracks, there is no record evidence of any dealings between the two prior to the events giving rise to the criminal investigations that would suggest, let alone establish, that Guth had a "vendetta" against Schell and was out to get him. In addition, although Schell contends in his brief on appeal that Guth and Barrett attacked his character, violated his right to privacy, and repeatedly and unnecessarily publicized the investigations and charges, he does not further develop these points in his brief and fails to support them with a citation to record evidence.

■ This brings us to Schell's negligence claim, wherein Schell alleges that Guth used unreasonable force in effectuating Schell's arrest, causing personal injury. Clearly, when a police officer arrests an accused on criminal charges, the officer is engaging in an activity of the kind and nature he is employed to perform. In addition, the undisputed record shows that Guth affected the arrest of Schell while on duty in the Reading Barracks. Moreover, we have no problem concluding that a police officer's arrest of the accused following the filing of criminal charges is, at least in part, for the purpose of serving his

law enforcement employer. Accordingly, each of the general scope-of-employment criteria we outlined in *Sanchez* are satisfied here.

This leaves us with the use-of-force criteria, which requires us to consider the record to determine whether the undisputed material facts of record compel the conclusion that Guth's conduct during the arrest that allegedly led to Schell's injury was not unexpected by Guth's employer, PSP. In considering this criteria, we note that Schell does not allege, and has not cited to any record evidence to support an argument, that Guth's conduct in effecting the arrest rose to the level of a crime, actual fraud, actual malice, or willful misconduct, all of which are considered to be outside of the scope of employment for purposes of sovereign immunity. *See Kull*, 81 A.3d at 154. Schell also does not allege that Guth intentionally harmed him. Instead, his claim is one of negligent use of force in effecting an arrest.

Schell recounted his arrest during his deposition in this matter. (R.R. at 748a–53a.) Upon entering the Reading Barracks for his shift, he testified that he was put up against the wall. Schell turned his head and came off the wall slightly, asking the troopers in attendance, including Guth, what this was about. Schell then testified that Guth again pushed him up against the wall, at which point he felt pain in his shoulder. He does not remember screaming. Guth then handcuffed Schell and the troopers escorted Schell to the basement, where he was fingerprinted, read his *Miranda*[8] rights, and informed of the charges against him.

Even accepting Schell's version of events as true,[9] and considering that his claim is predicated not on a willful use of excessive force, but on negligence in effecting an arrest, we conclude that Guth was operating in the course and scope of his employment when effecting the arrest of Schell. To the extent Schell was injured by negligent conduct of Guth during the process of that arrest, Guth is entitled to sovereign immunity unless Schell's negligence claim falls within one of the exceptions to sovereign immunity for negligence claims set forth in 42 Pa.C.S. § 8522(b). We cannot fathom any of the exceptions applying in this situation. *See Clark v. Se. Pa. Transp. Auth.*, 691 A.2d 988, 992 (Pa. Cmwlth.), *appeal denied*, 550 Pa. 686, 704 A.2d 640 (1997) (holding sovereign immunity barred negligence claim relating to use of force by SEPTA police officers).

## CONCLUSION

We have carefully examined the averments in the Complaint, the undisputed material facts, and the record on summary judgment. We understand that Schell believes that he was unjustly charged with criminal misconduct, evidenced by the fact that all but one of the charges were dropped pretrial and that he was acquitted of the sole remaining charge. He likely shares that feeling with many others ultimately acquitted of criminal charges in a court of law. His acquittal, however, does not necessarily mean that Guth and Barrett should be held civilly liable for their roles in the criminal and internal administrative cases against Schell.

As set forth above, there is simply a dearth of any evidence in the record upon which a jury could conclude that Guth or Barrett acted in such a way that they

---

8. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

9. In his deposition, Guth denied Schell's version of the events and disputed any injury. To the contrary, he testified that the arrest occurred without incident. (R.R. at 109a.)

could be found to have acted outside of the scope of their employment in this matter. Moreover, Schell's negligence claim against Guth cannot proceed because it does not fall into one of the statutory exceptions to sovereign immunity. We, therefore, will reverse the trial court's order and remand with instructions that the trial court enter judgment in favor of Appellants.

### *ORDER*

AND NOW, this 19th day of March, 2014, the order of the Court of Common Pleas of Berks County (trial court) denying summary judgment is REVERSED and the matter is remanded to the trial court to enter judgment in favor of Appellants.

Jurisdiction relinquished.